[Crim. No. 4518.   Second Dist., Div. Three.   Mar. 14, 1951.]

THE PEOPLE, Respondent, v. EDWARD DANIEL GREEN, Appellant.

Edward Daniel Green, in pro. per., for Appellant.

Fred N. Howser, Attorney General, and Norman H. Soko-low, Deputy Attorney General, for Respondent.

SHINN, P. J.—Defendant and one Howard Richard Hodge were jointly accused of the offenses of burglarizing a house and stealing a television set. Both were before the court at the preliminary hearing. Hodge at that time testified against Green. As will appear later, Green did not deny having been with Hodge, but did deny that he knew that Hodge was taking a set that did not belong to him. Hodge testified at the preliminary that Green did know that the set was to be stolen. Upon the trial he repudiated his testimony as to Green's guilty knowledge and testified that Green did not know that Hodge was stealing the set.

The transcript of the proceedings at the preliminary which was admitted at the trial as a part of the case of the People, discloses an astonishing bargain made by the prosecutor with Hodge for testimony unfavorable to Green. We quote from the record: "[Deputy District Attorney] Now, your Honor, at this time it is my understanding that the defendant Hodge is willing to take the stand and testify with reference to the facts covered by this complaint. In the event that Mr. Hodge does that, does take the stand and does testify, I am going to ask that the charge against him be dismissed. THE COURT: All right. [Deputy] I ask your Honor if he desires to take the stand, that you also warn him of his constitutional rights, his right against self-incrimination. Is it your desire to take the stand and testify in this case? DEFENDANT HOLDGE: It is my desire, but you said the case would be dismissed. Which one is that? [Deputy] That is this case. DEFENDANT HODGE: This one? [Deputy] The present case. DEFENDANT HODGE: The present case? [Deputy] Yes. DEFENDANT HODGE: No, I don't want to testify. (Recess taken.) [Deputy] Your Honor, the investigating officers have talked to Mr. Hodge during the recess and I understand that Mr. Hodge is now willing to take the stand. DEFENDANT HODGE: Yes, sure." The transcript shows clearly the bargain that was made in the courtroom during the recess, by means of which the unwilling Hodge was induced to admit his own part in the crimes, and to implicate Green. When he was called to the stand and was sworn, the court advised him that he need not testify, he was reminded that he had been bound

over for trial upon a separate charge, and the following occurred between Hodge and the deputy district attorney: "A. [Hodge] I understood you to say that you would dismiss one count against me, or something like that. [Deputy District Attorney] That is the Bergo count. [The present case.] You are named as codefendant with Mr. Green in the Bergo transaction. A. Yes. [Deputy] That is the one I will dismiss if you testify in this case. A. Sure. [Deputy] Or I will move to dismiss. A. Sure. THE COURT: And the purpose of that, I assume, is to hold the defendant Green? [Deputy] Yes. Now, except for this conversation here in court between you and I in which I have stated that I am going to move to dismiss this count, the Bergo count against you, *if Mr. Green is held to answer*, has anybody promised you any reward or immunity if you testified in this case? A. No, sir, they haven't. [Deputy] And it is your understanding that you still— *even if I get Mr. Green held to answer in this case today,* there still is another case against you? A. I understand, sir." (Emphasis added.)

Hodge thereupon testified as follows: A large 16-inch screen, console type, television set (valued at $431.75) was stolen by Hodge from the home of Thomas M. Bergo, on the night of December 17, 1949; Hodge had approached defendant, whom he had known at San Quentin, about stealing a television set; defendant agreed to help him and they left in defendant's car and proceeded to drive around looking for television antennae on house tops; when they found one on the roof of the Bergo home, Hodge left the car, went to the front door where he knocked several times, receiving no answer; he then walked around the side of the house to the back door, tore off the screen and entered; he dragged the television set to the front door and at his request defendant helped him move it to the car; they tried to sell it that night and the next day. Defendant did not testify at the preliminary other than to state to the court that "the only reason I was with him was I lent him my car."

At the trial, the story told by both Hodge and defendant was that Hodge asked defendant, whom he had known at San Quentin, if he wanted to help him deliver a radio to a friend, and that he would pay him $10 for his assistance. They left the café where they had met in defendant's car, stopping first at a "lady's house" (the home of Mrs. Clark), and defendant drove to the Bergo home following Hodge's direc-

tions; Hodge got out of the car, knocked at the front door and receiving no answer then walked to the rear of the house. Defendant testified that he thought it was Hodge's house; that the house was unlighted during the time Hodge was inside; that Hodge came out the front door pushing the set and that he then left the car and went up on the front porch to help Hodge with it; that the instrument would not go in the car so Hodge held it on the running board while he (Green) drove back to the "lady's house." Hodge and defendant both testified that defendant did not know the set was being stolen. When they arrived at the home of Mrs. Clark defendant said that he, Hodge, and "another man" carried the set into the house where Mrs. Clark and Hodge talked about it. Mrs. Clark testified that Hodge came in alone at first to talk to her about selling the set to her roomer; that she had bought another set from him for herself; that Hodge went out and came back with the defendant carrying the set; that Green took no part in the conversation. There is no evidence in the record to show that the conversation touched on whether or not the set was stolen. Defendant testified that Hodge told him he was going to pawn it as he needed the money. Mrs. Clark, Hodge and defendant all testified that the prospective purchaser was not present and that Hodge and defendant carried the set out. After leaving Mrs. Clark's home, the two men took the instrument to Hodge's room which was the last time defendant saw it.

We may say at this point that the testimony of Hodge at the preliminary hearing, if believed, was sufficiently corroborated by the testimony of defendant, and the circumstances in evidence, to support a finding that Green aided and abetted Hodge in committing the offenses. And we may also add that if Hodge had testified at the preliminary as he did at the trial Green, in all probability, would have been discharged.

The feature of the proceedings which we regard as of the utmost gravity is the one first mentioned, namely, the promise of immunity at the price of testimony which would result in Green's being bound over for trial. We do not attribute to the deputy who made that bargain on behalf of the State any unworthy motive. But the harm is just as great if the mistake was made by reason of inexperience and misguided zeal on the part of the prosecutor, as we believe was the case.

The broad question is whether a conviction may be allowed to stand where it rests chiefly upon testimony of an

accomplice, given under a promise of immunity upon the condition that the testimony he is about to give is such as will result in conviction of one jointly charged with the witness. Seldom have reviewing courts been called upon to answer this simple question.

In *Harris* v. *State*, 15 Tex.App. 629, the court considered an extraordinary situation brought about by an overzealous district attorney. The grand jury was investigating a murder. Six men were brought before it and were invited by the district attorney to testify, although warned that they need not do so. Each was told by the district attorney "that one of the parties would be released from prosecution and that it would depend upon the statements of each of the accomplices (or parties) to the murder, and the benefits to be derived therefrom, as to whether or not he would be the party released and to be used as a witness." Harris was told that he would be given immunity if "the State could be best served by releasing him from prosecution, and making of him a witness," but if the interest of the State would be best served by releasing any other of the accomplices, that would be done and Harris would be held. Six men were indicted; one of them, Colonel Austin, was granted immunity and testified for the State in such manner that Harris was convicted. The reviewing court, obviously shocked by the bargain that had been made, discussed the case as follows: "Should a conviction obtained by such means as are shown in the answer of the county attorney be sustained by this court?

"Strong and irrefragable proof would be required to induce us to believe that the county attorney would, to secure a conviction, offer a pecuniary bribe to witnesses. But a bribe offered to a witness, to disclose fairly and fully all of the facts in the case, does not approach the contract contained in this answer. In a proper case, the life or liberty of a witness may be offered him, upon condition that he testify faithfully and fully to all the facts in a case in which his accomplices are involved; but we have yet to find a case in which the parties suspected were permitted to enter the list as competitors for the high prize of life or liberty, success in this singular judicial contest made dependent upon superior accomplishments in the art of testifying in such manner as to secure the conviction of his fellow competitors. Whilst the victorious party may be made to rejoice and be exceedingly happy, the result to the less accomplished—the most inexperienced, but more honest and conscientious—by such a con-

test, is terrible indeed. Who would like to be made the victim of such a contract? Does public justice demand a resort to such means? Will public justice sanction it? Does this great commonwealth seek to convict and punish her citizens by such unjust, unfair, yea, foul means, as are shown in the answer of the county attorney? Is Texas a tyrant and her people tyrants? Would the best, most law abiding citizen of this State be willing to live under a code of laws which would sanction such procedure?

"Has this defendant had a fair trial? We think not, nor will we sanction a conviction upon testimony coming from such a source as that of Colonel Austin. This is not a pure stream; the fountain is corrupt. He is not merely an accomplice; he is a bribed accomplice, his life or liberty being the reward—bribed, not simply to testify fully and honestly, but to exceed the rest of his competitors in testifying to facts which would be most *beneficial* to the State. Not only so, but at the very time he was upon the witness stand, the indictment against him for the murder of Gabe Austin was hanging over him. Was there any chance of escape for defendant?

"A witness thus situated by the terms of the contract and the pendency of the indictment would, we believe, swear any and all things. But be this as it may, and be this witness competent or incompetent, we, nevertheless, will not sustain a conviction obtained in such manner. Common justice revolts at such means. Such a proceeding is repugnant to the spirit and genius of our criminal codes. While it is true that in some cases the life or liberty of an accomplice is offered him upon condition that he as a witness disclose fairly and faithfully all the facts relative to the crime, a race, however, is not made and the accomplices entered, with the life or liberty of the competitors as the stake. In this race there should be some very fast running (swearing); the result being, perhaps, the life, and at least the liberty, of the swiftest, and death or the penitentiary to the losers." The judgment was reversed. In denying a rehearing the court commented upon the youth of the district attorney, described him as a young gentleman of fine ability and great vigor and energy, and acknowledged that he had made his mistake "without the slightest thought or intention to violate even the proprieties, much less the sterner demands of right, justice or law." We refer to the court's remarks on rehearing as pertinent to our statement that it is immaterial whether the

grievous wrong done defendant Green resulted from want of appreciation of the gravity of the error.

The British Columbia Court of Appeal considered essentially the same grave question in *Rex* v. *Robinson,* 30 B.C. 369, 70 D.L.R., 755. The accomplice who was about to give his testimony after having made a statement to the police was informed by the court, that in accordance with the practice, he would be examined under an understanding that if he gave his evidence in an unexceptionable manner he would be recommended for a pardon. The reviewing court was of the opinion that the trial judge in the course of the examination gave the witness to understand that when his evidence was reviewed in considering a recommendation for a pardon, it would be expected that his testimony at the trial would be in conformity with the statements he had made to the police. The judgment was reversed. In the course of a clearly reasoned analysis of the situation it was said (pp. 761-762) : ''It is obvious that if the witness did get the impression from the Court that unless he told the same story to the Court as he did to the police, he would be executed, then his testimony was tainted beyond redemption and could not, in a legal sense, be weighed by the jury, because the witness was no longer a free agent and there was no standard by which his veracity could be tested or estimated. This is not merely a matter going to the credibility of the witness, but something fundamentally deeper, *viz.,* that by the action of the Court itself the witness was fettered in his testimony and put in so dire a position that the value of his evidence was not capable of appraisement, the situation being reduced to this, essentially, that while at the outset he was adjured to give his evidence freely and fully, yet later on he was warned that if it was not the same as he had already told the police he would be executed. Such a warning defeated the first object of justice, because what the witness should from first to last have understood was that, at all hazards, he was to tell the truth then in the witness box, however false may have been what he had said before in the police station. It is this element of uncertainty and the impossibility of determining the extent of it that makes this case so peculiar and unsatisfactory, and it cannot properly, in my opinion, be viewed as a question of credibility for the jury but one of frustration of their right to pass upon credibility. If the warnings complained of had taken place after the witness had finished his evidence, they could be said not to have had any harmful result, be-

cause they came too late to affect him, but unfortunately, if I may say so with all possible respect, the Judge went on to question him about a crucial matter—what he did with his revolver at the time of the shooting. How can anyone say if he gave a truthful answer to that question, and as to what occurred between him and the prisoner concerning it, when, in his fear, he made a fettered reply which had necessarily to be 'the same' as that which he had already told the police, if the shadow of the gallows was to be removed from him by his interrogator? . . . It cannot be denied that the accused was entitled, on every principle of natural as well as forensic justice, to this—that the witnesses brought forward against him should not have been influenced, least of all by the Court itself, however unwittingly, and that such a thing did nevertheless occur, comes clearly, in my opinion, within the expression 'that something not according to law was done at the trial'— Cr. Code, sec. 1019, R.S.C. 1906, ch. 146.

"It was recognized so far back as in the severe days of 1662, in *Tonge's* case, 6 How. St. Tr., at p. 227 [n], and so 'advised' (i.e., decided) by all the Judges that there should not be 'any threatenings used to them [accomplices] in case they did not give full evidence,' even in cases of treason, which were specially relentless. With every respect, I can only regard what happened here as also coming within this prohibition; whether what was said to the witness may be euphemistically styled a warning or an admonition, nevertheless it was also minatory and hence, in its practical and legal effect, indistinguishable from a threat." The court then considered whether, in the view taken of the procedure, a substantial wrong, and hence a miscarriage of justice, was occasioned at the trial, and answered this question in the affirmative.

The conclusions announced by the courts in the two cases from which we have quoted furnish a satisfactory, and we think conclusive, answer to the question in our case.

It is a practice which seems to be approved in all jurisdictions, if the ends of justice will be thereby served, to extend immunity to one jointly charged with crime, upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose. This was not the agreement made with Hodge. He was to give testimony that would satisfy the committing magistrate that Green should be bound over for trial; otherwise, he would stand trial with Green, and in view of the testimony he was about to give, would

surely have been convicted. It is not a question whether his first testimony was true or false, nor is it to be suspected that testimony was used which was known to the State to be false. We give no consideration to the fact that Hodge changed his story. This bore upon his credibility, which is of no concern in the present discussion. Whether Green be innocent or guilty he has not had a trial in accordance with the law of the land. A miscarriage of justice was occasioned through the use by the State of testimony which, because of the condition upon which immunity depended, was impure, dubious and "tainted beyond redemption."

The judgment is reversed and the cause is remanded for a new trial.

Wood (Parker), J., and Vallée, J., concurred.