746 P.2d 650

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Johnny Clifford ZINN,
Defendant–Appellant.**

No. 16817.

Supreme Court of New Mexico.

Dec. 2, 1987.

Jacquelyn Robins, Chief Public Defender, Kerry Kiernan, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Hank Farrah, Albuquerque, Trial Counsel.

Hal Stratton, Atty. Gen., Patricia Frieder, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Senior Justice.

A jury convicted defendant Johnny Clifford Zinn (Zinn) of nineteen separate felonies, including murder, kidnapping, criminal sexual penetration, robbery, fraudulent use of a credit card, and extortion, along with conspiracy and solicitation to commit various of the above crimes. Zinn appeals the jury's verdict and the sentence—life plus ninety-six years. For the reasons stated below, we affirm.

## FACTS

James Scartaccini (Scartaccini) came to know Zinn through Randy Pierce (Pierce) when the latter asked Scartaccini to help find for Zinn a woman who would be willing to perform sexual acts in front of movie cameras for a supposed pornography ring in Farmington. Police investigation carried out subsequent to the course of events discussed herein turned up no pornography ring. Scartaccini had never met Zinn, but Pierce had been living for some time under Zinn's roof. Pierce had approached the seventeen-year old Scartaccini in early January 1986, holding out the offer of $1500 for any "suitable" woman Scartaccini could find. Scartaccini later told his cousin, Thomas Sliger (Sliger), of Zinn's offer, and the latter joined forces with Scartaccini in attempting to find a woman who would accept Zinn's proposal.

Scartaccini and Sliger were unsuccessful in procuring a woman for Zinn, principally because Zinn either frightened away or repulsed the women whom Scartaccini and Sliger did manage to introduce to Zinn. Because of this failure, Zinn threatened Scartaccini and Sliger with death if they did not locate a woman by the weekend beginning Friday, January 10. Testimony of other witnesses who observed Scartaccini and Sliger during this time confirmed that the two men appeared terrified of Zinn. Upon Scartaccini's and Sliger's failure to find a woman by Saturday, January 11, Zinn instructed the two men to kidnap a woman, and thus Scartaccini and Sliger cooperated with Pierce in kidnapping a woman from an Albuquerque shopping center and taking her to a motel in Albuquerque, chosen by Zinn. After the victim had been brought to the motel, Zinn arrived and ordered the victim to disrobe. The four men then repeatedly raped and sodomized the victim while taking turns photographing her as she was being sexually assaulted. The photographs were later burned, and no record of them was found by the police. Zinn eventually left the room, placing Pierce in charge of the victim and of Scartaccini and Sliger. Scartaccini later contended that he had participated in the sexual assaults only at the behest of Zinn, but Sliger admitted voluntarily raping the victim on one occasion while his three accomplices were out of the room.

Zinn told Pierce to transport the victim out of Albuquerque. After loading the victim into Scartaccini's truck, Pierce drove the victim along with Scartaccini and Sliger to find Zinn in order to get further instructions. Following a meeting with Zinn at Jerry's Lounge, Pierce told Sliger and Scartaccini that Zinn had said to take the victim to the Jemez Mountains. During the drive to the Jemez Mountains, Pierce told Scartaccini and Sliger that "these girls don't

come back to Albuquerque." Shortly after that statement, following a phone call from Pierce to Zinn, Pierce told Scartaccini and Sliger that Zinn had told him (Pierce) over the phone to "get rid of her." Pierce found a culvert in a deserted area, led the victim to it, and shot her in the head with Scartaccini's gun. Immediately after the killing, Pierce expressed anger to Scartaccini and Sliger, telling them he had never killed a woman before, and that Zinn would "have to pay" for putting him in a situation in which he (Pierce) had to kill a woman.

Earlier, while in the motel room, Zinn had taken the victim's "Amigo" bank card from her purse and had instructed Pierce and Sliger to take the card to a bank's automatic teller and withdraw funds. Their incompetent attempts to use the card put bank officials on notice, and at one "Amigo" station, a photograph was taken of Pierce. When the victim was reported as missing, Pierce's photograph was shown on television, and a former girlfriend of Scartaccini, who had seen Pierce, Sliger and Scarticcini together before the kidnapping, called the police. On Friday, January 17, 1987, Scartaccini and Sliger were arrested and placed in separate facilities—Sliger being taken to the county jail in Albuquerque and Scartaccini to the Juvenile Detention Center in the same city.

That Friday evening defense attorney Leon Taylor (Taylor) was retained by Scartaccini's and Sliger's parents to represent their sons, and thus Taylor went to interview Scartaccini and Sliger separately at the two detention facilities. On Sunday, January 19, Taylor returned to interview his clients more extensively, each man still being held in a separate facility. Taylor later testified that after the Sunday interview he realized that more than kidnapping was involved (the police at this point did not realize the victim had been murdered), and he requested and received a conference with the district attorney. Taylor's first offer to the district attorney was "complete immunity—no holds barred, bottom line." After the district attorney considered Taylor's proposal, he responded, as Taylor recalls it, with a counteroffer requiring that Taylor's "information * * * provide a con-

viction." Taylor and the district attorney then executed the following immunity agreement (Agreement # 1):

1. Your clients (sic) no involvement in criminal activity other than [the case at bar].

2. Provide us with all information indicated by Leon [Taylor], and information is truthful.

3. Give us one of following:

   A. Return of [victim] alive

or

   B. *Conviction of her killers if [victim] is dead.*

4. Premised on your clients'

   A. Not being the killers

and

   B. Presenting reasonable evidence of duress or coersion (sic) in their involvement of the [victim's murder].

5. Clients fully cooperate, including truthful testimony, in all cases of which they have knowledge.

If you agree to foregoing, we will agree not to prosecute your clients.

[signatures of Taylor and district attorney] 1–19–86 (emphasis added).

Subsequent to Agreement # 1, on February 28, 1986, another agreement was put into writing (Agreement # 2) that essentially presented the terms of Agreement # 1 in a more formal style, but which omitted any wording as to the conviction of the victim's killers. Further, whereas Agreement # 1 was executed by the attorneys for the parties without prior knowledge on the part of either Scartaccini or Sliger as to the terms, Agreement # 2 was executed by Scartaccini and Sliger along with Taylor and the district attorney.

After the execution of Agreement # 1, Taylor's associate, Daniel Rakes, met with Scartaccini and Sliger. Rakes testified as to this meeting as follows:

I met with the clients at the police substation and I informed them that we had a deal where they would be granted immunity if they would tell the truth and cooperate with the police as to their involvement in the * * * murder.

When asked if Scartaccini and Sliger had understood the terms of the agreement, Rakes testified:

> Whether or not they understood, I really don't know. One of them had just been driving (sic) out of the detention center— he was asleep in the back of the police car and brought up and both of them were real hyper and excited and I tried to do my best to explain to them what was going on, but the main thrust of what I had told them was to tell the truth and cooperate with the police.

Shortly after Rakes met with Scartaccini and Sliger, at separate times and without the other present, each gave the police lengthy statements detailing the facts of the conspiracies, kidnapping, murder and sexual assaults. The statments were transcribed and later introduced into evidence. The statements, insofar as they pertained to Zinn's and Pierce's involvement in the crimes, did not deviate significantly from Scartaccini's and Sliger's later oral testimony presented both at the preliminary examination and at trial. Likewise, the statement of neither man differed significantly from the statement of the other.

At the preliminary hearing, when Taylor was asked by the trial court if it was his understanding that the absence of "conviction of her killers" from Agreement # 2 meant that if the killers were acquitted Scartaccini and Sliger "would still have their immunity," Taylor answered, "That's correct. My clients walk whether these people get convicted or not." When Scartaccini and Sliger were questioned at the preliminary examination as to their understanding of Agreement # 1, Scartaccini said nothing about the conviction requirement, while Sliger acknowledged his awareness of that provision. Both men stated they understood they were to tell the truth.

Pierce and Zinn were joined as co-defendants, but Pierce eventually entered a guilty plea and was sentenced to life imprisonment plus thirty-six years. Pierce did not testify at Zinn's trial. The following issues are before us on appeal.

## I. DID THE IMMUNITY AGREEMENT AND RESULTING INCULPATORY TESTIMONY DEPRIVE ZINN OF A FAIR TRIAL?

On appeal, Zinn argues that Agreement # 1, premised as it was on "Return of [victim] alive or conviction of her killers," was an impermissible condition to the grant of immunity in that it coerced testimony calculated to return a guilty verdict against Zinn regardless of the actual facts. This is an issue of first impression in New Mexico, and the parties in their briefs rely on a substantial number of federal and other out-of-state authority. In doing so, the parties do not disagree as to what the law is. Rather, they disagree as to the applicability of the law to the facts of this case.

The leading federal authority is *United States v. Dailey*, 759 F.2d 192 (1st Cir. 1985), wherein the government granted accomplices an immunity agreement in which the government promised to recommend a specific term of imprisonment "depending principally upon the value to the Government" of certain desired testimony. *Id.* at 194. The court held that the agreement did not deny the defendant's right to due process because the trial court had provided the following traditional safeguards: (1) informing the jury of the exact nature of the agreement; (2) permitting defense counsel to cross-examine the accomplices concerning the agreement; and (3) instructing the jury to weigh the accomplices' testimony carefully. By way of dictum the court stated, "[W]e note that at present we can think of no instance in which the government would be justified in making a promised benefit contingent upon the return of an indictment or a guilty verdict." *Id.* at 201.

The court in *United States v. Waterman*, 732 F.2d 1527 (8th Cir.), *vacated en banc by an equally divided court*, 732 F.2d 1533 (8th Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985) at first reversed the trial court's decision in a case where the government's immunity agreement was conditioned on an accomplice's giving testimony that would lead to further indictments. Without com-

ment, the court then vacated its decision, so that *Waterman* stands for the proposition that the agreement under review did not deprive the defendant of a fair trial. The court in *Dailey* took notice of *Waterman*, but only to point out that the facts before it did not present as much of a risk to a defendant's right to fair trial as did the facts reviewed by the Eighth Circuit in *Waterman*. The dictum in *Dailey* doubtless was intended as a restrictive comment on *Waterman*.

Generally speaking, the rule in the federal circuits is as follows. So long as an immunity agreement falls short of requiring that an accomplice's testimony return a conviction against the defendant, and so long as the traditional safeguards outlined in *Dailey* are provided, the defendant is said not to have been denied a fair trial. *See United States v. Miceli*, 446 F.2d 256 (1st Cir.1971); *United States v. Insana*, 423 F.2d 1165 (2d Cir.), *cert. denied*, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970); *United States v. Vida*, 370 F.2d 759 (6th Cir.1966), *cert. denied*, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630 (1967); *but see United States v. Valle–Ferrer*, 739 F.2d 545 (11th Cir.1984), in which an agreement conditioned on testimony resulting in a conviction was said *not* to have deprived the defendant of a fair trial. Further, so long as permissible agreements as discussed above are involved, the federal circuits do not look upon an accomplice's testimony under an immunity agreement as a question of admissibility, but as a question of credibility, *United States v. Evans*, 697 F.2d 240 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983), and as evidence to be weighed by the jury, *United States v. Gomez*, 810 F.2d 947 (10th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987).

The rule in the state courts is slightly stricter than in the federal circuits. In *People v. Green*, 102 Cal.App.2d 831, 228 P.2d 867 (1951), the court struck down a conviction where an immunity agreement was conditioned on an accomplice's testimony leading to the defendant's being bound over for trial. In *People v. Medina*, 41 Cal.App.3d 438, 116 Cal.Rptr. 133 (1974), the court reversed a conviction in a situation where the immunity agreement provided that the accomplice must not deviate in her testimony from her earlier recorded statement given to police. The court interpreted such an arrangement as meaning that the accomplice was placed "under a strong compulsion to testify in a particular fashion." 41 Cal.App.3d at 455, 116 Cal. Rptr. at 145. The decision in *Medina*, however, is limited by *People v. Allen*, 42 Cal. 3d 1222, 232 Cal.Rptr. 849, 729 P.2d 115 (1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 202, 98 L.Ed.2d 153 (1987), where an immunity agreement was not executed until after an accomplice made a pre-trial statement. The accomplice then testified in accord with his earlier statement to the police. The court held that the accomplice was not, by the holding in *Medina*, placed "under a strong compulsion to testify in a particular fashion." 42 Cal.3d at 1255, 232 Cal.Rptr. at 867, 729 P.2d at 132. As in the federal circuits, so too in the state courts, the principal requirement for the validity of an immunity agreement is that the accomplice testify truthfully, *People v. Lucev*, 188 Cal.App.3d 551, 233 Cal.Rptr. 222 (1986); likewise, absent an agreement that induces an accomplice to testify in a certain fashion, the testimony of an accomplice goes to credibility, not to admissibility. *State v. Blevins*, 108 Idaho 239, 697 P.2d 1253 (App.1985), *State v. Nerison*, 136 Wis.2d 37, 401 N.W.2d 1 (1987).

We now turn to an analysis of Agreement # 1. It must be kept in mind that at the time the agreement was executed the district attorney did not yet know that the victim had been murdered or if she had been murdered, who her murderers were. The purpose of Agreement # 1 was to provide the district attorney with "information" leading either to the return of the victim alive or to the conviction of her killers if she was dead.

It is obvious then that Agreement # 1 focused on the State's attempt to investigate its gradually forming case, and *not* on the State's efforts to direct its prosecutorial gaze upon Zinn. This fact alone makes the agreement different from any agree-

ment censured by the cases we have just discussed. Had the State known that Zinn was its principal defendant, then Agreement # 1 would conceivably have been suspect as conditioned upon the accomplices' giving the State a certain result directed against a certain defendant. As it was, however, the statements which Scartaccini and Sliger made to the police were just as inculpatory of Pierce (if not more so, since he pulled the trigger) than they were of Zinn.

The essential question to be asked here is what risk for perjury existed on the night that Scartaccini and Sliger gave their statements to the police. In answering that question, we must keep in mind that unlike the other immunity agreements we have reviewed in the cases above, this was an agreement negotiated between a defense attorney and a prosecuting attorney. The fact that Scartaccini and Sliger were not aware that the negotiations were going on, and had no opportunity to enter into them, greatly reduces the risk that they would perjure themselves in giving their statements. Zinn asks us to make a substantial leap of faith when he argues that once Scartaccini and Sliger learned that Taylor and the district attorney had concluded an agreement, Scartaccini and Sliger from different jail cells simultaneously concocted a false story that was the same in all essentials.

Even given the possibility that Scartaccini and Sliger possessed the mental acumen to piece together a virtually identical story of the kidnapping and murder (which seems unlikely, since they initially had failed to construct a credible story placing them in Muleshoe, Texas on the weekend in question), it also must be remembered that it was not Agreement # 1 which was controlling by the time of trial, but Agreement # 2, and the latter agreement said nothing about Scartaccini and Sliger returning a conviction.

Finally, Taylor's recollection of Agreement # 2, as meaning that his clients would be granted immunity regardless of the outcome of Zinn's trial, likewise demonstrates that the State had used Agreement # 1 not to make a case against Zinn, but simply to make a case. As such, Agreement # 1 was a proper inducement promoting the State's investigation and was not prejudicial to Zinn, either before or during his trial.

## II. DID CERTAIN COMMUNICATIONS BETWEEN THE COURT AND JURY PREVENT ZINN FROM RECEIVING A FAIR TRIAL?

█ While the jury was deliberating, the jurors sent several written questions to the court. During the time that five of these questions were presented to and answered by the court, Zinn was not present because his attorney had waived his presence. On appeal, Zinn does not challenge the propriety of the court's answers. Instead, he challenges the State's attempted rebuttal of the prejudice presumed by his absence. On the day after the jury was excused (October 1, 1986), we issued our decision in *Hovey v. State*, 104 N.M. 667, 726 P.2d 344 (1986), in which we held that there is a presumption of prejudice in the precise situation which arose here, and that the State bears the burden of rebutting the prejudice by showing on the record that the communication did not affect the jury's verdict.

The State attempted to do just that, first by presenting testimony from the foreperson, and then by introducing two affidavits signed by all the jurors. In the first affidavit each juror swore as follows:

1. None of the answers to any of the questions effected (sic) the deliberations concerning the murder counts or resulted in a conviction on those counts.

2. No answers received on our questions resulted in the change of our vote on any count.

3. None of the answers, except the definition of a credit card, contributed to or resulted in a conviction on any count and that definition effected (sic) only the Fraudulent (sic) use of a credit card count and not other counts.

In the second affidavit each juror swore as follows:

1. None of the answers received resulted in any new discussion or any new areas of discussion.

2. None of the answers received by us resulted in a revote on any of the counts.

3. None of the answers to any questions were discussed during the deliberations on the murder counts.

For clarification, we note that the third statement in the first affidavit resulted from a required response to the jury's question concerning the definition of a credit card as provided in SCRA 1986, 14–1689. Zinn does not challenge the trial court's response as given. We conclude that the court correctly ruled that Zinn did not effectively waive his right to be present during the various communications between the court and jury. This was in keeping with *Hovey*.

The next question is whether the State effectively rebutted the prejudice which arose. Zinn contends the State did not, on the strength of *State v. McClure*, 94 N.M. 440, 612 P.2d 232 (Ct.App.1980), arguing that because the State did not show "that the improper communication occurred after the jury was 'ready to return a verdict,'" (citations omitted), *id.* at 442, 612 P.2d at 234, the State's affidavits avail nothing. We disagree. One method by which the State could have rebutted the prejudice would have been by doing as Zinn argues, but that was not the *only* method by which the State could have rebutted the prejudice. The underlying purpose of the court's ruling in *McClure* was to establish a situation in which the jury's verdict was not affected by the communication: "[T]o overcome the presumption the State must show that the comunication did not affect the verdict." *Id.* at 442, 612 P.2d 234. Here, while the State did not show that the communication between court and jury occurred after the jury was ready to return a verdict, it nonetheless showed that the communication, except in the understandable instance of the credit card definition, did not affect the verdict.

Zinn argues further, however, that the testimony elicited from the foreperson, and the affidavits signed by all the jurors, were received into evidence contrary to the provisions of SCRA 1986, 11–606(B). That section reads as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about what he would be precluded from testifying be received for these purposes.

Zinn would put the State in a double bind. He argues that the State must rebut the prejudice which arose as a result of the communications in question. Yet, if the State attempts to rebut that prejudice, even, let us assume, by showing that the jury had already agreed on its verdict, how is the State to meet its burden except by making an inquiry into the effect which the court's answers had on the jury? The purpose of SCRA 1986, 11–606(B) is to prevent tampering and harrassment of the jury and inquiry into its deliberations to the end of casting doubt on the jury's competence. *State v. Barela*, 91 N.M. 634, 578 P.2d 335 (Ct.App.), *cert. denied*, 91 N.M. 610, 577 P.2d 1256 (1978). The State did not contravene that purpose here.

Further, it should be kept in mind that SCRA 1986, 11–606(B) is a rule of evidence and not a rule of procedure taking on constitutional dimensions, as Zinn apparently would have it. Like any rule of evidence, this one too may be waived. Zinn raised no objection at trial either to the State's introduction of the foreperson's testimony or of the affidavits, and thus he may not be heard now to object to the introduction of that evidence.

### III. WERE STATEMENTS BY PIERCE IMPROPERLY ADMITTED INTO EVIDENCE?

■ Zinn argues that the court improperly admitted into evidence Scartaccini's and Sliger's testimony of Pierce's statement to them on the way to the Jemez Mountains in which Zinn had told Pierce to "get rid of" the victim. We note that Zinn did not object to the introduction of this testimony when Scartaccini testified as to Pierce's statement. Six days after Scartaccini testified, Sliger testified to the same effect, and only then did Zinn object. It is obvious that by the time Sliger testified, the jury had had ample opportunity to reflect upon the substance of Scartaccini's testimony. It would have been of little effect for the trial court to have sustained Zinn's objection to Sliger's testimony, even assuming there had been grounds for doing so, because the statement objected to had already been planted—properly—in the jurors' minds.

Nonetheless, we will undertake an analysis of Zinn's argument as to the introduction of Sliger's testimony. The admissibility of Pierce's statement is governed by SCRA 1986, 11–801(D)(2)(e), which allows into evidence a statement that otherwise would be hearsay when the statement is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy." Under prior decisions it was well-settled that "[o]ut of court statements made by a co-conspirator about matters relating to the conspiracy are not admissible unless and until a prima facie case of conspiracy is shown by other independent evidence." *State v. Harge*, 94 N.M. 11, 17, 606 P.2d 1105, 1111 (Ct.App.1979), *rev'd sub nom.*, *Buzbee v. Donnelly*, 96 N.M. 692, 634 P.2d 1244 (1981). This decision, however, is qualified by that in *State v. Mead*, 100 N.M. 27, 665 P.2d 289 (Ct.App.), *modified sub nom.*, *State v. Segotta*, 100 N.M. 498, 672 P.2d 1129 (1983), where the court of appeals held, "We have pointed out that the foundational requirement of proof of a conspiracy by independent evidence need not be met at the time the State offers the co-conspirator's statement. The

trial court may rule conditionally." *Id.* 100 N.M. at 30, 665 P.2d at 292.

Here the record provides abundant independent evidence to substantiate the testimony of Scartaccini and Sliger. While their testimony is the only evidence depicting what took place within the motel room, there is more than sufficient corroborating evidence as to the events leading up to the kidnapping and sexual assaults to render Scartaccini's and Sliger's testimony credible as to the kidnapping, sexual assaults and murder. Further, the events which took place after the victim was transported from the motel room until she was murdered strengthen both Scartaccini's and Sliger's story as well as the corroborating testimony provided by the other witnesses. "The gist of conspiracy is the agreement, and such agreements are rarely susceptible of direct proof. Consequently, circumstantial evidence is sufficient to support a conspiracy conviction." *State v. Johnston*, 98 N.M. 92, 95, 645 P.2d 448, 451 (Ct.App.), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982). From our reading of the record, there can be no reasonable doubt that Zinn, Pierce, Sliger and Scartaccini entered into agreements to kidnap and sexually assault the victim, and that at least Zinn and Pierce conspired to murder the victim. Independent evidence of a conspiracy to commit murder comes from the Zinn–Pierce meeting at Jerry's Lounge immediately before the trip to Jemez, and from the Zinn–Pierce telephone conversation immediately before the killing. It is this sequence of events, taken from Zinn's clear conspiratorial involvement to that point of time, that is independent evidence from which it could have been inferred beyond a reasonable doubt that Zinn conspired to transport the victim to Jemez and that he conspired in her death which followed immediately after his telephone call from Albuquerque to Jemez.

Thus, because substantial independent evidence appears in the record as to the conspiracies, the trial court did not err in admitting testimony as to Pierce's statement. Moreover, even if this were not the case, the Supreme Court has ruled recently that the trial court is not required to ignore

the statement being offered if the content of the statement itself is reasonably supportive of a conspiracy when taken together with the other independent evidence of the conspiracy. *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 95 L.Ed.2d 144 (1987).

Zinn makes the further argument that even if the testimony was properly admitted under the co-conspirator exception to the hearsay rule, the testimony was nonetheless prejudicial because the State did not show that Pierce was unavailable. Thus, Zinn argues, he was denied his constitutional right to confront a witness (Pierce) testifying against him. Zinn's argument as to this point is without merit. The Supreme Court has also recently ruled that there is no requirement under the Confrontation Clause for the prosecution to show that a nontestifying co-conspirator is unavailable to testify when his out-of-court statement is offered into evidence against the defendant/co-conspirator. *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

■ Zinn next argues that Pierce's other out-of-court statements and assertions were improperly admitted, such as his statements that he had never killed a woman before and he "would make Zinn pay" for having been ordered to kill the victim. We conclude that the trial court properly admitted this statement as a present sense impression under SCRA 1986, 11–803(A). The remainder of Zinn's challenges to the evidence are without merit.

Finally, we dispose of Zinn's last challenge on appeal in which he attacks the trial court's instructions to the jury as to the felony murder count. Zinn argues that because only Pierce's statements could have justified the instruction which the court gave, because only those statements could have served as a predicate for causality under the felony murder instruction, the felony murder verdict must be reversed. Since, however, we have ruled above that Pierce's statements were admissible, Zinn's argument as to this point is without merit.

The judgment and sentence of the trial court is affirmed in its entirety.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and RANSOM, J., concur.

STOWERS, J., not participating.

WALTERS, J., concurring on issues one and two, dissenting as to issue three.

WALTERS, Justice (concurring in part, dissenting in part).

I concur in the majority's disposition of Issues I and II. I do not agree, for several reasons, with its decision regarding admission of the statements allegedly made by Pierce, Zinn's alleged co-conspirator in the counts related to first degree murder.

There was clearly sufficient evidence to link defendant with the several criminal counts of kidnapping and sexual assault. Sliger and Scartaccini were co-conspirators and co-actors in those acts of criminal conduct and, consequently, their testimony relating to those counts, insofar as it implicated defendant Zinn, patently was admissible under SCRA 1986, 11–801(D)(2)(e). But aside from Sliger's and Scartaccinni's telling the jury what they said Pierce told them that Zinn had said to Pierce, there was not a shred of evidence, nor an inference therefrom, that a conspiracy to murder the victim existed or was ongoing at the time the alleged statements of Zinn were said to have been made, as related by Pierce.

The evidence, to the point of Pierce's purported statement that Zinn had told him to "get rid of" the victim, was that some persons from Farmington were to come to Albuquerque to pick up the kidnapped woman; that those arrangements somehow aborted and Pierce told Scartaccini and Sliger that the three of them would have to take the victim out of Albuquerque; that they put her in Scartaccini's truck and drove to an Albuquerque location where Pierce met with Zinn and allegedly was told to drive her to the Jemez Mountains where they would be met by the Farmington persons to whom they would transfer the

woman; that Pierce was to call Zinn from Jemez to find out the exact location for meeting with the contingent from Farmington, and that Pierce did attempt to call Zinn when the party reached Jemez. Zinn, not at home when Pierce telephoned, returned Pierce's call when he was told of it.

That is the total sum and substance of any evidence, to that point, of the criminal conduct engaged in by Zinn, Pierce, Sliger and Scartaccini on the day of the murder. But it is precisely at that point that Sliger and Scartaccini were permitted to repeat what they say Pierce told them that Zinn had told Pierce, which could be interpreted as directing the murder of the victim, and to relate what Pierce had commented following his shooting of the victim. If there was a conspiracy to murder, there was no independent evidence whatever that the conspiracy was formed before the Jemez telephone call. Thus, the only evidence of the existence of a conspiracy to murder is Pierce's statement itself, and it was only upon the allowance of the witnesses' statements of Pierce's comments that an inference of conspiracy to murder surfaced in the evidence.

The majority opinion recognizes, by its quotation from *State v. Harge,* 94 N.M. 11, 606 P.2d 1105 (Ct.App.1979), that a prima facie case of conspiracy must first be shown by independent evidence before a co-conspirator's statement regarding the conspiracy may be admitted. But in paying lip service to that rule, the majority then side-steps the crucial analysis of whether there was *independent evidence of a conspiracy to murder* by declaring there was "abundant independent evidence" to infer the truthfulness of Sliger's and Scartaccini's testimony. I respectfully submit that *that is not* the issue, nor is it the answer, nor is it independent evidence of the underlying *fact* of a conspiracy between Pierce and Zinn that would permit introduction of Pierce's statement implying a conspiracy to prove a conspiracy.

The *independent* evidence shows that Pierce committed the murder. Although there is overwhelming evidence of Zinn's participation in all of the criminal acts prior

to the murder, there is absolutely no evidence, independent of Pierce's statements, that Zinn conspired with him to murder the young woman who was kidnapped and assaulted. The statements of Pierce cannot be used both to create the independent evidence necessary to permit the statements to be admitted, and to prove the conspiracy, too.

The trial court was obliged to first determine the admissibility of the twice-removed statements of Pierce. SCRA 1986, 11–104(A). In assessing admissibility of an alleged co-conspirator's statement, most federal jurisdictions accept the proposition that the evidence to be assessed to permit introduction of the statement must be independent of the statement itself. *United States v. Martorano,* 561 F.2d 406, 408, n. 2 (1st Cir.1977) (listing other circuits), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978). The salubrity of that approach was articulated in *United States v. James,* 590 F.2d 575, 581 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979):

> Although Rule 104(a) provides that the court "is not bound by the Rules of Evidence except those with respect to privileges" we do not construe this language as permitting the court to rely upon the content of the very statement whose admissibility is at issue. We adhere to our requirement * * * that fulfillment of the condition of admissibility must be established by evidence independent of the co-conspirator statement itself * * *. [A]dmissibility must depend upon independent evidence in order to prevent this statement from "lift[ing] itself by its own boot straps to the level of competent evidence." *Glasser v. United States,* 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680] (1942).

"Bootstrapping" is exactly what was permitted in the instant case.

*Harge* is not unique in requiring independent evidence before a co-conspirator's statement may be admitted. We said in *State v. Sheets,* 96 N.M. 75, 77, 628 P.2d 320, 322 (1981), in reversing the admission of statements under SCRA 1986, 11–

801(D)(2)(e), that "[o]nce the [co-conspirator's] 'statements' are eliminated, there is nothing that permits an inference of a conspiracy between [the co-conspirator] and defendant * * *. Lacking this proof * * * the trial court erred in admitting [the] * * * 'statements.'"

In addition to *James* and the federal cases relied on in *Harge,* numerous other federal courts, as well, applying the identical rule, have held that lack of independent evidence of a conspiracy and defendant's participation in it prevent the admission of a co-conspirator's statement regarding the alleged conspiracy. *See, e.g., Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313 (8th Cir.1986); *In re Japanese Electronic Products Litigation,* 723 F.2d 238, 260–61 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 568 F.Supp. 205, 214 (E.D.N.C.1983), *aff'd,* 763 F.2d 604 (4th Cir.1985); *United States v. Stanley,* 765 F.2d 1224, 1243–44 (5th Cir.1985); *World of Sleep, Inc. v. La-Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985); *United States v. Mankani,* 738 F.2d 538, 547 (2d Cir.1984); *United States v. Holloway,* 731 F.2d 378, 381 (6th Cir.), *cert. denied,* 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984); *United States v. Dahlstrom,* 713 F.2d 1423, 1428 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); *United States v. Reynolds,* 715 F.2d 99, 103 (3d Cir.1983); *Filco v. Amana Refrigeration, Inc.,* 709 F.2d 1257, 1267 (9th Cir. 1983); *United States v. Cambindo Valencia,* 609 F.2d 603, 631 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980).

Thus, as a *basic* premise, the first statement of Pierce testified to by Scartaccini and Sliger regarding the alleged conspiracy to "get rid of" the kidnapped woman was inadmissible for lack of any evidence other than *that* statement itself to show the existence of such a conspiracy.

Secondly, even if the co-conspirator evidence rule were applicable, it is not at all settled that defendant's constitutional right to confrontation of his accuser automatically has been met. *See State v. Martinez,* 99 N.M. 48, 51, 653 P.2d 879, 882 (Ct.App.), *cert. denied,* 99 N.M. 47, 653 P.2d 878 (1982); *United States v. Perez,* 658 F.2d 654, 660–62 (9th Cir.1981). Pierce did not appear at trial and testify, and there was no showing that he was unavailable. *Bourjaily v. United States* (cited by the majority), notwithstanding, there was no evidence relied on by the State to show that anything Pierce had said at any time had any particular "indicia of trustworthiness," *United States v. Wright,* 588 F.2d 31, 38 (2d Cir.1978), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979), so as to avoid the confrontation clause infirmities attending admission of an alleged co-conspirator's statement. *See Perez; see also State v. Earnest,* 106 N.M. 411, 744 P.2d 539, (1987).

Finally, the post-murder comments of Pierce were admitted under an exception to the hearsay rule, SCRA 1986, 11–803(A). Any exception to the rule is likewise subject to Sixth Amendment scrutiny. *State v. Martinez,* 99 N.M. at 51, 653 P.2d at 882. The United States Supreme Court said in *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970), that "the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stems [sic] from the same roots. But this Court has never equated the two, and we decline to do so now."

Despite a burgeoning number of cases permitting introduction of evidence under exceptions to the hearsay rule, or in accordance with the co-conspirator rule, it is beyond the pale of any honest, intellectual analysis that I am capable of performing to concede that any court might conscientiously arrive at a conclusion that a legislative- or judge-made rule of evidence can eradicate a constitutional right. See discussion at 4 Weinstein's Evidence ¶ 800[04] (1987). If that is what the United States Supreme Court and federal courts have done with respect to federal constitutional rights, it surely is not a path the jurisprudence of

New Mexico is required to or should follow insofar as the right to confrontation is protected by our state constitution. The New Mexico constitution is an independent document and it is "our responsibility to separately define and protect the rights of [New Mexico] citizens despite conflicting decisions of the United States Supreme Court interpreting the federal Constitution." *People v. Disbrow,* 16 Cal.3d 101, 127 Cal.Rptr. 360, 545 P.2d 272 (1976). Interpretations of rules of evidence which whittle away constitutional rights reflect an abdication by this court of its responsibility as "the ultimate arbiter of the law of New Mexico," *State ex rel. Serna v. Hodges,* 89 N.M. 351, 356, 552 P.2d 787, 794 (1976), and of our individual oaths to uphold the constitution of this state.

I would affirm the convictions and sentences imposed in this case, except for those convictions and sentences respecting crimes of commission or related to first degree murder, which I would reverse for failure of proof by legally admissible evidence.