Certiorari Denied, March 8, 2012, No. 33,448

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-039**

**Filing Date: January 26, 2012**

**Docket No. 29,817**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**SHEILA BAHNEY,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**John W. Pope, District Judge**

Gary K. King, Attorney General
Ann M. Harvey, Assistant Attorney General
Santa Fe, NM

for Appellee

Jacqueline Cooper, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**HANISEE, Judge.**

**{1}** Defendant Sheila Bahney appeals from six counts of criminal conviction that are the result of her participation in the kidnapping, killing, and incineration of Barbara Lumsey, as well as the attempted cover-up of those crimes. We reject the bulk of Defendant's arguments and affirm all but one of her convictions, the lone exception being conspiracy to commit aggravated arson. Supported by recent New Mexico case law, we hold that Defendant's

separate conspiracy convictions, based on one overarching agreement, violate double jeopardy. Based also on our precedent, we reject Defendant's remaining double jeopardy contentions and hold that the evidence presented at trial was sufficient to support the jury's verdict. We also determine that the trial court did not abuse its discretion by admitting photographs which included images of Lumsey, her injuries, and the crime scene, and conclude Defendant has failed to establish ineffective assistance of trial counsel. We therefore affirm in part, reverse in part, and remand with instructions to vacate Defendant's conviction for conspiracy to commit aggravated arson and re-sentence accordingly.

## I.  BACKGROUND

**{2}**  On November 4, 2005, at approximately 7:00 p.m., Barbara Lumsey was found dead in the trunk of a still-burning vehicle adjacent to a public elementary school in Belen, New Mexico. Forensic investigators determined that although she was severely beaten—her hyoid bone and the thyroid structure in her throat having been fractured, and a molar dislodged—it was the fire that caused her death. The circumstances of Lumsey's homicide are the subject of Defendant's underlying convictions and this appeal.

**{3}**  The State's evidence showed that at the time of the murder, Defendant lived in her Belen mobile home with three other individuals: her husband, Tom Bahney; her five-year-old grandson, Bobby; and her godson, Angel Esquibel. Esquibel's girlfriend, Jessica Cavasos, frequently stayed at the Bahney residence and was a participant in the crimes against Lumsey. Also involved were Anthony Sanchez and Patricia Sipes, neighbors and friends of Esquibel.

**{4}**  In the early morning hours of November 4, 2005, Defendant and her husband left for work, leaving Esquibel to prepare Bobby for school and ensure that he boarded the school bus at 7:30 a.m. Following Bobby's departure for school, events leading to Lumsey's death began to rapidly unfold: (1) Lumsey drove her car to the Bahney residence and spoke with Esquibel, (2) Esquibel viciously beat Lumsey after an argument, covering her head and upper torso, his hands, and parts of the living room with blood, (3) Esquibel enlisted the assistance of Cavasos and Sanchez following the initial assault and kept Lumsey quiet by threatening her with a knife retrieved by Sanchez, (4) Esquibel force-fed Lumsey a handful of prescription pills located by Cavasos within the Bahney residence, and (5) Esquibel washed Lumsey's blood from his body, dressed, and contacted Defendant, who said she would be home "within five to ten minutes."

**{5}**  Upon her return at 10:30 a.m., Defendant walked through the front door and encountered a bloodied, beaten, and drugged Lumsey lying and moaning in the hallway, with Esquibel, Cavasos, and Sanchez watching over her. Defendant and Esquibel had a brief, private conversation, and Esquibel helped Defendant carry groceries into the mobile home. Afterward, Defendant sat at a computer in the living room, within close proximity to Lumsey, who was positioned in the hallway immediately adjacent to the living room. Defendant remained seated and silent when Esquibel forced Lumsey to rise and walk into

2

his bedroom, where he duct-taped her hands and tied her to his bed frame with rope.

**{6}**     Esquibel then telephoned Sanchez, who had returned to his own mobile home, and instructed him to come back to the Bahney residence because Defendant wanted to speak with him.  When Sanchez returned, Defendant—who remained seated at the living room desk playing computer games—"looked at [Sanchez] and kind of giggled and said, 'You don't look too good.'"  Sanchez replied, "No, this is bullshit.  I don't belong here." Defendant then asked Sanchez if he needed "to smoke a bowl."  Sanchez agreed and smoked marijuana with Defendant before again returning to his home across the street.

**{7}**     Tom Bahney arrived home from work at 11:15 a.m. and also spoke privately with Esquibel before entering the front door.  Once inside, he sat on the living room couch directly across from Defendant—who remained at the computer —and began to watch television.  Esquibel paced back and forth in the hallway between his bedroom where Lumsey lay bound and tied and the living room where the Bahneys sat.  He repeatedly muttered "bitch" in Spanish, and expressed agitation regarding an impending civil court hearing in Albuquerque that he was required to attend at 1:30 p.m. that day.  At approximately noon, Esquibel declared his intention to take Lumsey "to the state police office and kill her there and turn himself in."  Defendant abruptly spoke in opposition to Esquibel's plan, saying "don't do it, just go to court."  Esquibel agreed, acquired the car keys from Tom Bahney, and he and Cavasos walked to the door to depart for court.  On the way out, Esquibel instructed the Bahneys to "watch [Lumsey]" and "make sure she [did not] make any noise."  No conversation ensued, yet when Esquibel and Cavasos returned three hours later the Bahneys remained posted at the house—Defendant at the computer and Tom Bahney stationed in the hallway.  Neither had notified the police and, consistent with Esquibel's wishes, Lumsey remained affixed to the bed, helpless and unassisted during Esquibel's lengthy absence.

**{8}**     Once home, Esquibel immediately checked on Lumsey and demanded that Cavasos help her go to the bathroom.  When Cavasos refused, Esquibel grabbed her by the throat and asked her whether she wanted to end up like Lumsey.  Cavasos broke loose from Esquibel's grip in the hallway and walked toward the living room, but Esquibel again grabbed her violently, this time by the hair.  Defendant and Tom Bahney quickly reacted in defense of Cavasos, telling Esquibel, "Don't do it."  Esquibel promptly released Cavasos, who tearfully retreated to the living room sofa.

**{9}**     Shortly following her intervention on behalf of Cavasos, Defendant instructed Esquibel in a demanding tone to "do something or figure something out because Bobby [is] going to be home soon."  Esquibel quickly enlisted the aid of Patricia Sipes, who lived with Sanchez across the street.  Sipes followed Esquibel's requests and "wiped . . . down" Lumsey's car, which had been parked outside the Bahney residence since her arrival that morning.  As well, Esquibel instructed Cavasos to help Sipes gather Lumsey's effects and bring them into the Bahney home.

3

**{10}** At approximately 4:00 p.m., Bobby arrived home from school and the Bahneys met him at the front door with toys and instructions to play outside. Even then, Lumsey remained duct-taped and tied to Esquibel's bed. Esquibel resumed pacing the hallway between the bedroom and the living room, checking on Lumsey periodically, until he announced to everyone in the living room, "I'm going to just torch the car." Shortly thereafter, Defendant stated that she was "going to take Bobby to Walmart." Esquibel instructed Cavasos to accompany Defendant and Bobby.

**{11}** Esquibel and Tom Bahney remained at the Bahney home with Lumsey, while the two women and Bobby proceeded to Walmart. There, they walked around for nearly forty-five minutes, including an extended stop to watch lobsters in the store tank, without placing a single item in their shopping cart. At some point, Esquibel called Cavasos's mobile phone to request lighter fluid and asked to speak with Defendant. After Defendant's short conversation with Esquibel, she turned the cart and proceeded directly to the aisle containing charcoal lighter fluid. Cavasos accompanied her, and the women acquired the last two remaining bottles of lighter fluid in the store. They stopped briefly to get Bobby some food for dinner before checking out at the register. Defendant paid for each item purchased, including the lighter fluid. The trial record confirms that Defendant had no typical household need for charcoal lighter fluid, as there existed only a propane-fueled barbeque grill at the Bahney residence.

**{12}** Shortly after 6:00 p.m., Defendant, Cavasos, and Bobby arrived home. Defendant placed a box containing both bottles of lighter fluid on the kitchen counter and told Esquibel, "It's in the box. It's over there." Thereafter, Defendant, joined by Bobby, retreated to a bedroom separate from that occupied by Lumsey. By all accounts, Defendant had no further contact with any of the other adults until after Lumsey's car, with Lumsey imprisoned within it, had been successfully set ablaze and abandoned.

**{13}** Esquibel, Cavasos, Sipes, and Tom Bahney undertook the process of removing Lumsey from the house in order to depart the Bahney residence. Sipes positioned Lumsey's vehicle on the opposing side of a five-foot-tall fence immediately behind the mobile home. Esquibel doused the car with the lighter fluid purchased and supplied by Defendant, and used wire cutters retrieved by Cavasos to disable the release cable normally accessible within the interior trunk. Esquibel and Tom Bahney led Lumsey outside—with her hands still bound—before lifting and dropping her over the fence, head first, into her own open trunk. Sipes then drove Lumsey's lighter-fluid-soaked car, with Lumsey trapped in the trunk, to the nearby elementary school located several miles from the Bahney residence. Esquibel and Tom Bahney followed Lumsey's vehicle in a separate car, while Cavasos remained at the Bahney residence to clean away evidence of Lumsey's beating. On the roadside adjacent to the school, Lumsey's car was lit on fire. The trio immediately returned to the Bahney residence in the remaining vehicle, having been alarmed by a school custodian who observed them, and who following their departure notified police. Lumsey's vehicle burned, with her imprisoned in the trunk, for nearly ten minutes before emergency services arrived. Due to the volume of accelerant poured into and upon Lumsey's vehicle, firefighters were unable

to completely extinguish the flames for approximately twenty additional minutes. The fire resulted in Lumsey's death and the consumption of much of the vehicle's interior, as well as both rear tires.

{14}    After the series of crimes against Lumsey was completed and she was dead, the Bahney household directed their attention to the ongoing clean-up effort. Cavasos continued to scrub Esquibel's room where Lumsey had been tied to the bed, as well as the living room wall, a chair, and a portion of flooring that was spattered with Lumsey's blood. The next day, Defendant washed the blood-stained living room blinds and reported her accomplishment to Esquibel. In the ensuing days, the Bahney residence returned to normalcy. Defendant transported Cavasos to and from work, and Defendant and Tom Bahney even attended a concert at the Route 66 Casino the evening after Lumsey's murder. Shortly thereafter, all participants were identified by law enforcement and arrested.

{15}    In district court, each case was independently resolved. Cavasos and Sanchez pleaded guilty to lesser crimes and were called as witnesses by the State during Defendant's trial. Tom Bahney pleaded guilty to first-degree murder. Following the commencement of his own trial, Esquibel entered into a plea agreement where he too pleaded guilty to first-degree murder, as well as related crimes. Sipes and Defendant were tried separately and each was convicted by a jury of second-degree murder, in addition to a handful of ancillary charges, including for Defendant: kidnapping, aggravated arson, conspiracies to commit each, and tampering with evidence. Defendant presents each of the following arguments on appeal: (1) her convictions are unsupported by sufficient evidence, (2) the multitude of convictions based on the same conduct violates double jeopardy, (3) the district court abused its discretion in admitting photographs of Lumsey's charred body and vehicle, and (4) her trial counsel was ineffective by failing to inform her of her right to testify, failing to call an alibi witness, and failing to object to certain testimony. We examine each claim in detail below.

## II.    DISCUSSION

### A.    Double Jeopardy

{16}    We begin our legal analysis by reviewing Defendant's contentions that many of her convictions violate the double jeopardy clauses of the United States and New Mexico Constitutions. Double jeopardy affords a criminal defendant three layers of protection: (1) "protects against a second prosecution for the same offense after acquittal"; (2) "protects against a second prosecution for the same offense after conviction"; and (3) "protects against multiple punishments for the same offense." *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991). This appeal relates to the third level of protection identified by *Swafford*, which has been further divided into two categories: "unit of prosecution" cases—"in which a defendant has been charged with multiple violations of a single statute based on a single course of conduct," and "double-description" cases—"in which a defendant is charged with violations of multiple statutes for a single conduct[.]" *State v. DeGraff*, 2006-NMSC-011,

¶ 25, 139 N.M. 211, 131 P.3d 61. In this case, Defendant maintains that double jeopardy bars (1) her conviction of two conspiracy counts based on facts that amount to a single overarching agreement under our "unit of prosecution" analysis; and (2) her remaining five convictions, with the exception of tampering with evidence, under our "double-description" analysis. While our precedent within New Mexico case law defeats the latter contention, we do agree that under these facts Defendant's double jeopardy rights were violated by her separate conspiracy convictions.

{17}     Recently, the New Mexico Supreme Court addressed double jeopardy in the context of multiple conspiracy convictions in a strikingly similar case, *State v. Gallegos*, 2011-NMSC-027, 149 N.M. 704, 254 P.3d 655. In *Gallegos*, the Court applied our "unit of prosecution" analysis to the crime of conspiracy. *Id.* ¶¶ 31, 50 (describing our "unit of prosecution" analysis as asking first whether "the statutory language spells out the unit of prosecution," and second, if no legislative guidance is apparent, determining whether a defendant's acts are separated by sufficient "indicia of distinctness" to justify multiple punishments under the same statute (internal quotation marks and citation omitted)). Based on its detailed analysis of NMSA 1978, Section 30-28-2 (1979) (Conspiracy), the Court determined that "the Legislature established what we will call a rebuttable presumption that multiple crimes are the object of only one, overarching, conspiratorial agreement subject to one, severe punishment set at the highest crime conspired to be committed." *Gallegos*, 2011-NMSC-027, ¶ 55. The Court adopted "[t]he totality of the circumstances test utilized by the federal circuits" in announcing the nature of evidence required to overcome the presumption. The test asks whether:

> (a) the [location] of the two alleged conspiracies is the same; (b) there is a significant degree of temporal overlap between the two conspiracies charged; (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted co-conspirators); and (d) the overt acts charged and the role played by the defendant . . . [in the alleged conspiracies are] similar.

*Id.* ¶¶ 56, 42 (alterations in original).

{18}     Applying the framework adopted in *Gallegos* to Defendant's convictions for conspiracy to commit kidnapping *and* aggravated arson, we hold that Defendant "entered into only one agreement and took part in only one conspiracy." *Id.* ¶¶ 57, 62 (holding that conspiracies of first-degree murder, kidnapping, and aggravated arson must merge in light of the fact that "the conspiracy to commit kidnapping should be understood as one aspect of a larger continuous combination that eventually embraced murder as its central objective"). As in *Gallegos*, the conspiracies of which Defendant was convicted involved a single victim and each embraced a collective intent by co-conspirators to inflict an interrelated series of harms upon her. *See* NMSA 1978, § 30-4-1 (2003) (stating that conspiracy to commit kidnapping requires a finding that Defendant intended to hold Lumsey "against [her] will [and] to inflict death [or] physical injury."); *see also* NMSA 1978, § 30-17-6 (1963) (stating

6

that conspiracy to commit aggravated arson requires a finding that Defendant "willful[ly] or malicious[ly] . . . set[] fire to . . . [Lumsey's] vehicle . . . causing [Lumsey] great bodily harm"). Both conspiracies served to inflict personal injury on Lumsey and eliminate her ability to freely depart her surroundings. Additionally, the series of events occurred over a relatively short time frame, and the same individuals participated in and were implicated by both charged conspiracies.

{19} We therefore agree with Defendant that she and her co-conspirators formed one overarching agreement, rather than two distinct agreements separated by time and space. Furthermore, even were we to credit her "argument that [she] was unaware of the plot to [commit arson and] murder while taking part in the initial kidnapping, it does not follow that Defendant entered a new combination when [she] later joined [her] confederates in their efforts" to commit additional offenses. *Gallegos*, 2011-NMSC-027, ¶ 62.

{20} Defendant's second double jeopardy argument, which challenges five counts of conviction based on our aforementioned double description analysis, has already been defeated in *State v. Carrasco*, 1997-NMSC-047, 124 N.M. 64, 946 P.2d 1075. In *Carrasco*, a getaway driver was convicted of five separate offenses: conspiracy to commit robbery and accessory to attempted robbery, aggravated battery, aggravated assault, and false imprisonment. *Id.* ¶ 1. The getaway driver's only obvious role within the trial record was drinking with his co-conspirators earlier in the evening and later driving them away from a convenience store directly following a robbery attempt. *Id.* ¶¶ 3-4. Thus, he was not physically present during the commission of any offenses committed within the convenience store. The Court applied *Swafford*, in the requisite two-part query: (1) "whether the conduct underlying the offenses is unitary," and (2) "whether the Legislature intended to impose multiple punishments for the unitary conduct." *Carrasco*, 1997-NMSC-047, ¶ 22. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Swafford*, 112 N.M. at 13, 810 P.2d at 1233.

{21} Assuming without concluding that the collective criminal conduct of Defendant and her co-conspirators was unitary under the first prong of the *Carrasco* test, we elect to address the latter, Legislative-intent prong. We note that although we follow the *Carrasco* approach here and presume unitary conduct under the first prong, our case law separately makes it clear that analysis pursuant to either prong can be dispositive of a *Swafford*-governed double jeopardy challenge. *See, e.g.*, *State v. Urioste*, 2011-NMCA-121, ¶¶ 16-29, 267 P.3d 820, *cert. quashed*, 2012-NMCERT-008, ___ P.3d ___ (No. 33,287, August 17, 2012) (rejecting double jeopardy challenge to convictions of voluntary manslaughter, kidnapping, and aggravated battery based upon the conclusion that the underlying conduct was *not* unitary). Accordingly, we must ascertain whether the underlying crimes "require[] proof of at least one element that the other does not." *Carrasco*, 1997-NMSC-047, ¶ 28 (internal quotation marks and citation omitted). Where elements are distinct within the crimes being compared, "a presumption exists that the Legislature intended to separately punish the . . . offenses." *Id.* ¶¶ 23, 28.

7

**{22}** We conclude that second-degree murder, kidnapping, and aggravated arson each requires a unique element the others do not. Thus, guided by *Carrasco*, we too conclude that "[the d]efendant has not brought forth indicia of legislative intent to overcome the presumption that the Legislature intended to punish" second-degree murder, aggravated arson, and kidnapping separately. *Id.* ¶ 29.

**{23}** Defendant's contention that her conspiracy convictions should merge with the substantive crimes that underlie them similarly fails. This is so whether she was convicted as an accessory or as a principal. "The crimes of conspiracy and accessory to a crime are separate offenses based on separate acts for which the Legislature has intended multiple punishments." *Id.* ¶ 36; *see State v. Armijo*, 90 N.M. 12, 15, 558 P.2d 1151, 1154 (Ct. App. 1976) ("[C]onspiracy and the completed offenses are separate offenses and conviction of both does not amount to double jeopardy.").

**{24}** In sum, while we find no merit in Defendant's second double jeopardy claim, we must reverse as to her conviction for conspiracy to commit aggravated arson. "[T]he appropriate remedy is to vacate . . . [the] redundant [conspiracy conviction] with punishment imposed on the single remaining conspiracy at the level of the 'highest crime conspired to be committed,' [which in this circumstance] is a conspiracy to commit" kidnapping. *Gallegos*, 2011-NMSC-027, ¶ 64 (internal quotation marks and citation omitted); *compare* § 30-4-1(B) ("[C]ommit[ing] kidnapping [that results in physical injury] is . . . a first degree felony."), *with* § 30-17-6 ("[C]ommit[ing] aggravated arson is . . . a second degree felony."); *see also* NMSA 1978, § 30-28-1 (1963) (punishing conspiracy to commit first-degree felonies as second-degree felonies and conspiracy to commit second-degree felonies as third-degree felonies). Accordingly, we remand to the district court to vacate Defendant's conviction for conspiracy to commit aggravated arson and adjust Defendant's sentence in a manner consistent with this Opinion.

## B.     Sufficiency of the Evidence

**{25}** Defendant next maintains that there is insufficient evidence to support any of the six counts of which she was convicted. As to each such claim, our review of the trial record must defer to "the jury's fundamental role as factfinder" yet satisfy our autonomous responsibility "to ensure that . . . jury decisions are supportable by evidence in the record, rather than mere guess or conjecture." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641. We "view the evidence in the light most favorable" to the jury's guilty verdicts, which must be based upon proof "beyond a reasonable doubt with respect to every element essential" to the convictions. *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted); *see State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (forbidding the substitution of appellate judgment for that of a jury).

**{26}** We divide the six crimes of conviction into categories of review for ease of analysis:

(1) accessory liability, (2) conspiracy, and (3) principal liability. The verdict sheets returned by the jury did not specify whether its determinations of Defendant's guilt for second-degree murder, aggravated arson, and kidnapping were based on principal or accessory liability, though both theories were presented to the jury. Because we need only find sufficient evidence under one of the theories presented to uphold Defendant's convictions, we choose to address each of the three crimes under the State's theory of accessory liability. *See State v. Salazar*, 1997-NMSC-044, ¶ 43, 123 N.M. 778, 945 P.2d 996 ("[D]ue process does not require a general verdict of guilt to be set aside so long as *one of the two* alternative bases for conviction is supported by sufficient evidence."). We separately address the sufficiency of Defendant's remaining conviction for conspiracy and her conviction for tampering with evidence as a principal.

## 1. Accessory Liability Convictions

**{27}** In New Mexico, a person may be "convicted of [a] crime as an accessory if he procures, counsels, aids or abets in its commission[,] although he did not directly commit the crime." NMSA 1978, § 30-1-13 (1972). Likewise, "[a] person who aids or abets in the commission of a crime is equally culpable" and faces "the same punishment as a principal." *Carrasco*, 1997-NMSC-047, ¶ 6. Under New Mexico's Uniform Jury Instructions, a defendant may be found guilty of a substantive offense as an accessory, if the jury finds beyond a reasonable doubt that:

1. Defendant intended that the crime be committed;
2. The crime was committed;
3. Defendant helped, encouraged or caused the crime to be committed.

UJI 14-2822 NMRA.

**{28}** Unlike other states that employ the "natural and probable consequences" test for accessory liability, *see, e.g.*, *People v. Beeman*, 674 P.2d 1318, 1326 (Cal. 1984) (in bank) (stating that accomplice liability extends to the natural and reasonable consequences of the acts that the accessory knowingly and intentionally aids and encourages), New Mexico law requires that a jury "find a community of purpose for *each* crime of the principal." *Carrasco*, 1997-NMSC-047, ¶ 9. In other words, "a jury must find that a defendant *intended* that the acts necessary for *each* crime be committed." *Id.*

**{29}** Under our approach to accessory liability, Defendant elects to challenge the sufficiency of only some of the elements essential to her convictions for second-degree murder and aggravated arson, conceding the others. As to each offense, she challenges the initial element—that she intended those crimes to be committed. She agrees with the jury that the crimes were in fact committed, and even that her actions "helped, encouraged or caused" their commission. Regarding the crime of kidnapping, Defendant asserts that both the elements of intent and that she acted to help, encourage, or cause the crime's occurrence are unmet.

9

**{30}** Defendant's challenge to the evidence that underpins the jury's determination of her guilt for second-degree murder and aggravated arson rests on three specific assertions of insufficiency: (1) no evidence was presented that Defendant was aware the lighter fluid would be used to kill Lumsey or burn her car, (2) the evidence presented merely proved Defendant knew Lumsey was being held by Esquibel, not that her life was at stake, and (3) although Defendant heard Esquibel say he was going to "torch the car," she was not an active participant to the conversation and was later "sealed off" from the actual killing of Lumsey. We disagree with Defendant's arguments and hold that the evidence was sufficient to establish the requisite *mentes reae* of second-degree murder and aggravated arson.

**{31}** Notably, there is no legal requirement within our jurisprudence that an accessory know in advance the exact method by which a crime is to be carried out, or even that the accessory be physically present when the crime is committed. Again, *Carrasco* is instructive. There, despite evidence that the defendant remained in the getaway car from which he was unable to observe his criminal companions attack the lone clerk on duty at Allsup's convenience store, our New Mexico Supreme Court upheld his convictions as an accessory to each of the crimes—false imprisonment, assault, and aggravated battery. *Carrasco*, 1997-NMSC-047, ¶ 19. Based on evidence that the defendant had been "cruising and drinking" with his companions earlier that evening, had personal knowledge of Allsup's shifts and hours having himself worked at an Allsup's for nearly six months, and finally that he drove his fleeing companions quickly from the store following the attempted robbery, the Court held "a rational jury *could* have inferred . . . that [the d]efendant intended the false imprisonment, assault with intent to commit a violent felony, and aggravated battery on the store clerk be committed to accomplish the robbery." *Id.* ¶¶ 12, 14.

**{32}** Likewise here, a rational jury could infer that Defendant intended both the burning of Lumsey's car and her death, based upon Defendant's personal communication with Esquibel and its consistency with her actions. Those communications, which occurred throughout the day, demonstrated the existence of a joint criminal enterprise. And Defendant's presence during Esquibel's verbal brainstorming, during which he considered both murdering Lumsey and torching her car, placed Defendant on notice of the potential ends of that enterprise. Finally, individual actions that supported the jury's verdict include: (1) Defendant's calloused response and provision of marijuana as a gesture meant to soothe Sanchez's discomfort at being recruited by Esquibel as an assistant following the beating of Lumsey, (2) her lack of intervention on Lumsey's behalf when contrasted with her quick defense of Cavasos against Esquibel's briefly redirected violence, (3) her and her husband's de-facto compliance with Esquibel's request to ensure Lumsey did not escape or make noise during his three-hour absence, (4) her demand that Esquibel "figure something out" before Bobby returned from school, followed by her absence of spoken objection to Esquibel's idea of "torch[ing] the car" when contrasted with her vocal and successful protests of his previous idea to kill Lumsey at the state police office and turn himself in, (5) her retreat with Bobby to a separate bedroom while others led Lumsey out of the house to her death, and most tellingly, (6) the physical purchase and provision of charcoal lighter fluid for Esquibel. Of the many tangible activities undertaken by Defendant in furtherance of the crimes against

10

Lumsey, it is this latter action which singularly appended a match tip to the bare stick that was Esquibel's idea to burn Lumsey's car, a plan that provided no unrelated fate for Lumsey herself.

**{33}** Based on the evidence listed above, it is within the purview of a rational jury to have concluded Defendant acted in concert with Esquibel and played a supporting role in the murder and arson. We disagree with Defendant's assertions that there is no direct evidence of her own intention to kill or cause great bodily injury to Lumsey, or to burn her car. Indeed, it is inadequate to conclude that her actions merely enabled the homicide when in fact she provided the one missing ingredient needed to transform an object designed by automotive engineers to be incombustible into a mobile pyre. Even absent such an extraordinarily inculpatory fact, however, the "[c]ircumstantial evidence alone can amount to substantial evidence." *Flores*, 2010-NMSC-002, ¶ 19; *see Duran*, 2006-NMSC-035, ¶¶ 7-8 ("Intent is subjective and is almost always inferred from other facts in the case[.]" (internal quotation marks and citation omitted)). Further, the jury was aware that the Bahney household had no need for charcoal lighter fluid from the standpoint of outdoor food preparation, based upon the presence of only a propane grill at the residence. We conclude that facts within the trial record are sufficient to convict Defendant of each of the elements of second-degree murder and aggravated arson, as an accessory, beyond a reasonable doubt.

**{34}** Defendant similarly challenges the sufficiency of the evidence supporting her kidnapping conviction. She argues that there was inadequate proof of her intent to kidnap Lumsey, and that she helped, encouraged or caused the kidnapping. Defendant insists that the record is devoid of indicia that she agreed to watch Lumsey while Esquibel went to court and asserts that the kidnapping had already been perpetrated by Esquibel before Defendant arrived home. She also maintains her fear of Esquibel wholly dictated her actions during the entire Lumsey episode. Again, we are unpersuaded.

**{35}** In reviewing the sufficiency of the evidence, an appellate court "does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Sutphin*, 107 N.M. 126, 130-31, 753 P.2d 1314, 1318-19 (1988). Rather "we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. Here again, there was substantial evidence presented for the jury to infer that following Defendant's arrival home, she became an important participant in the ongoing forcible restraint of Lumsey. She not only sat idly at the computer while Lumsey remained constrained in the bedroom, she and her husband did nothing to free Lumsey and instead continued Lumsey's imprisonment for a three-hour period after Esquibel requested they do so. It is well settled in New Mexico that kidnapping is a continuing crime, and it is immaterial that Esquibel had already initiated the kidnapping before Defendant arrived. *See State v. Hutchinson*, 99 N.M. 616, 624, 661 P.2d 1315, 1323 (1983) ("Kidnapping which involves the detention of another[] is a continuous offense."). Finally, Defendant herself confirmed to police detectives that at no time was Lumsey free to leave, even during the

11

three-hour period in which she and Tom Bahney were alone with Lumsey. Based on the trial record of facts and the reasonable inferences that can be derived from them by a considered jury, a finding that Defendant shared Esquibel's intent that Lumsey's kidnapping continue unabated, and that she "helped, encouraged or caused" its continuance by her own activities over a period of many hours, is demonstrably supported by sufficient evidence.

## 2.    Conspiracy Convictions

**{36}**    As discussed previously, Defendant's conviction on conspiracy to commit aggravated arson is vacated on double jeopardy grounds. Thus, we need only review the sufficiency of the evidence for conspiracy to commit kidnapping. Once more, Defendant primarily contends that because the State's evidence did not prove she was present when Lumsey was initially beaten and because there was no direct communicated acceptance to Esquibel's command to watch and listen to Lumsey while he was absent, her conviction for conspiracy to commit kidnapping is legally deficient.

**{37}**    We disagree with Defendant's characterization of our law. In the context of conspiracy liability, New Mexico has long held it unnecessary "to prove [the existence of] a formal agreement to accomplish the illegal act." *State v. Deaton*, 74 N.M. 87, 89-90, 390 P.2d 966, 967-68 (1964); *see also Territory v. Leslie*, 15 N.M. 240, 245, 106 P. 378, 379 (1910). In fact, the crime of conspiracy is rarely proven by direct evidence. *Deaton*, 74 N.M. at 90, 390 P.2d at 968 ("[A]greement is generally a matter of inference deduced from the facts and circumstances, and from the acts of the person accused done in pursuance of an apparent criminal purpose."). When Defendant arrived home, it was apparent that Lumsey was being held against her will and had been severely beaten. For many of the same reasons a jury could properly find Defendant guilty of the substantive crime of kidnapping, it could as well reasonably infer that Defendant agreed, together with Esquibel, Tom Bahney, and others with whom the kidnapping was perpetrated, to collectively foreclose any possibility that Lumsey's freedom would be regained.

**{38}**    The body of interaction by the team of participants to the crimes against Lumsey—each perpetrated while Lumsey was in some manner restrained—invited the jury's reasonable inference that Defendant not only joined the conspiracy, but that when expressly called upon to do so by her co-conspirator, she assumed responsibility for the ongoing kidnapping. The evidence presented of a shared agreement to commit and perpetuate the crime of kidnapping meets the substantial evidence test required by our jurisprudence.

## 3.    Principal Liability Conviction—Tampering with Evidence

**{39}**    As a final sufficiency point of appeal, Defendant challenges the trial record's support of the jury's conclusion that she tampered with evidence. She maintains the State failed to prove both that she intended to prevent her own apprehension, prosecution, or conviction when she washed blood spatter from her living room blinds the day following the Lumsey homicide, and that she was not "acting under threats and a reasonable fear of her safety" at

the time. As discussed above, there was sufficient evidence for the jury to conclude that Defendant joined a criminal enterprise united in purpose as to each of the crimes that led to the death of Lumsey. The previous day's events in furtherance of that enterprise provide decisive context to Defendant's effort to later clean the deceased victim's blood from the blinds. That final action, we conclude, was wholly enmeshed with the prior undertakings of Defendant and her co-conspirators. Each concerted criminal activity served to build the evidentiary inference that when Defendant was wiping away human blood she was concerned with more than the cleanliness of her home. The jury was well within its fact-finding prerogative to conclude that Defendant's removal of blood evidence that would undoubtedly have been usable by the State against her was intended to prevent her own apprehension, prosecution, and conviction.

**{40}** Finally, the jury was presented with substantial evidence showing that Defendant's actions were not dictated by her fear of Esquibel, a conclusion we cannot second guess. *See* UJI 14-5130 NMRA ("[When e]vidence has been presented that the defendant was forced to [commit the crime] under threat[s], . . . [t]he burden is on the state to prove beyond a reasonable doubt that the defendant did not act under such reasonable fear."). Her contrary contention is primarily repudiated by her failure to extract herself from the criminal events when twice having opportunities to do so, first during Esquibel's lengthy absence and then during her trip to Walmart. Further repudiating her claim that she too feared physical harm at the hand of Esquibel are her ably asserted demands that he abandon his plan to turn himself over to state police, cease separately battering Cavasos, and resolve the obvious incongruence between the immediate presence of a captive and the pending arrival of a child. Finally, her professed fear of Esquibel is poorly demonstrated by her placation of Sanchez's discomfort and her later voluntary provision of far more than just double the volume of lighter fluid required for normal use. We conclude that the trial record of Defendant's statements and actions belies the notion that she was subservient as a product of self-preservation.

## C. The Trial Court Did Not Abuse Its Discretion by Admitting the Crime Scene Photographs

**{41}** At trial, Defendant objected to the admission of over forty of the State's photographs taken during the crime scene investigation. The defense stipulated to the admissibility of merely two photographs in the set: one of Lumsey's charred body lying in the trunk of the burned car with police investigators standing by, and the other of Lumsey's body lying on a sheet after being removed from the car. The district court considered each of the challenged photographs in light of Rule 11-403 NMRA, and excluded the three for which it felt "the prejudice outweigh[ed] any possible probative value." Thus, forty of the initial forty-five photographs were admitted into evidence over Defendant's objections.

**{42}** We review a trial court's determination that items of evidence are admissible for abuse of discretion, *Flores*, 2010-NMSC-002, ¶ 25, which "occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Simonson*,

13

100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983). "[R]elevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Rule 11-403. Nevertheless, "[t]he trial court ought to exclude photographs which are calculated to arouse the prejudices and passions of the jury and which are not reasonably relevant to the issues of the case." *State v. Boeglin*, 105 N.M. 247, 253, 731 P.2d 943, 949 (1987).

**{43}** Graphic photographs of the injuries suffered by deceased victims of crime are by their nature significantly prejudicial, but that fact alone does not establish that they are impermissibly so. District courts are afforded "great discretion in balancing the prejudicial impact of [evidence] against its probative value." *State v. Garcia*, 2005-NMCA-042, ¶ 50, 137 N.M. 315, 110 P.3d 531 (internal quotation marks and citation omitted). Indeed, photographs may be admitted for proper purposes, "even if they are gruesome." *Id.* Such purposes include depicting the nature of an injury, clarifying and illustrating testimony, and explaining the basis of a forensic pathologist's expert opinion. *Id.* "Photographs are the pictured expressions of data observed by a witness. They are often more accurate than any description by words, and give a clearer comprehension of the physical facts than can be obtained from the testimony of witnesses." *State v. Pettigrew*, 116 N.M. 135, 139, 860 P.2d 777, 781 (Ct. App. 1993) (internal quotation marks and citation omitted).

**{44}** Of the forty photographs challenged by Defendant, six showed Lumsey's body after being burned to death. The six were close-ups of her body and head, which collectively showed that the fire had burned the left side of her body to the point of charring, but had spared some of her right side. The pictures were a graphic depiction of the results of the arson and murder with which Defendant was charged, and thereby relevant to the elemental requirement that the State show the crimes contained within the indictment were in fact undertaken and completed.

**{45}** The remainder depicted the burning car, fire damage to its interior and exterior, firefighters as they extinguished the flames, and the location where the vehicle was burned. All were relevant, in that each made the existence of essential elements of the crimes of murder and arson more probable within the burden of proof assigned to the State. None were more prejudicial than probative—they simply showed the scene as it was investigated, with no undue emphasis on the burned body or anything that would unfairly prejudice Defendant. We cannot say the admission of illustratively neutral photographs defied logic to a degree necessary to conclude that the trial court abused its discretion in its determinations of admissibility.

**{46}** As to each image, the record is clear that the district court weighed the probative and prejudicial impact outside the jury's presence and excluded the three that it felt were excessively prejudicial. Based on the trial court's consideration of Defendant's arguments and analysis of the photographs, we see nothing to indicate that it did not employ its discretion appropriately. Nor can we conclude that even if there was error, it was not harmless in nature. *Pettigrew*, 116 N.M. at 139, 860 P.2d at 781 ("[W]e are unaware of any case that has reversed a conviction due to allegedly inflammatory photographs.").

14

**{47}** In fact, we see nothing to distinguish this case from the many cases in which district courts from around the State have properly used their discretion to admit graphic photographs of victims. *See, e.g.*, *State v. Saiz*, 2008-NMSC-048, ¶ 54, 144 N.M. 663, 191 P.3d 521 (holding that the district court did not abuse its discretion by admitting five gruesome photographs of the victim's decomposed body, when those photographs aided the pathologist's testimony), *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783; *State v. Mora*, 1997-NMSC-060, ¶¶ 54-55, 124 N.M. 346, 950 P.2d 789 (upholding the admission of multiple autopsy photos of child victim on grounds that they were illustrative), *abrogated on other grounds by State v. Frazier*, 2007-NMSC-032, ¶ 1, 142 N.M. 120, 164 P.3d 1; *State v. Perea*, 2001-NMCA-002, ¶ 22, 130 N.M. 46, 16 P.3d 1105 (holding that a potentially inflammatory photograph of a victim's slashed face was relevant and that its admission was within the discretion of the district court), *aff'd in part, vacated in part*, 2001-NMSC-026, 130 N.M. 732, 31 P.3d 1006; *Boeglin*, 105 N.M. at 253, 731 P.2d at 949 (holding that the admission of a close-up photograph depicting gruesome neck wounds suffered by the victim was proper to "illustrate, clarify, and corroborate the testimony of witnesses"); *Pettigrew*, 116 N.M. at 139, 860 P.2d at 781 (holding that photos of battered victim were relevant to depict the extent of the victim's injuries and to illustrate a physician's testimony, and their admission was not an abuse of discretion); *State v. Blakley*, 90 N.M. 744, 748, 568 P.2d 270, 274 (Ct. App. 1977) (holding that admission of photograph of the victim's body was proper because it "illustrated, clarified, and corroborated the testimony of various witnesses"). We will not disturb the trial court's judgment on these facts.

**D.     There is No Prima Facie Evidence of Ineffective Assistance of Counsel**

**{48}** Defendant last argues she received ineffective assistance of counsel based on three purported inactions by her trial attorney:  (1) failure to locate a known alibi witness, (2) failure to inform Defendant of her right to testify, and (3) failure to object to second-hand statements originating from Esquibel. We review claims of ineffective assistance of counsel de novo. *Duncan v. Kerby*, 115 N.M. 344, 347-48, 851 P.2d 466, 469-70 (1993). In order to establish a prima facie case of ineffective assistance of counsel on direct appeal, a defendant must demonstrate that: (1) counsel's performance fell below that of a reasonably competent attorney; (2) no plausible, rational strategy or tactic explains counsel's conduct; and (3) counsel's apparent failings were prejudicial to the defense. *See State v. Herrera*, 2001-NMCA-073, ¶ 36, 131 N.M. 22, 33 P.3d 22. As Defendant acknowledges, "[a] record on appeal that provides a basis for remanding to the [district] court for an evidentiary hearing on ineffective assistance of counsel is rare. Ordinarily, such claims are heard on petition for writ of habeas corpus." *State v. Baca*, 1997-NMSC-059, ¶ 25, 124 N.M. 333, 950 P.2d 776.

**{49}** Defendant's first two claims of ineffective assistance concern matters not in the appellate record. Defendant argues that she identified an alibi witness to defense counsel, but he failed to locate the witness during trial. She also argues that defense counsel did not inform her of her right to testify and effectively prevented her from testifying in her own defense. We have no basis to be aware of the occurrence or nonoccurrence of these

15

conversations other than Defendant's assertions on appeal. While we are willing to review matters of record for prima facie evidence of ineffective assistance of counsel, we will not afford the same benefit to arguments based on matters outside the trial record. *State v. Telles*, 1999-NMCA-013, ¶ 25, 126 N.M. 593, 973 P.2d 845 (holding that without a record, we cannot consider claims of ineffective assistance of counsel on direct appeal). Such claims are best reserved for habeas corpus, in which a subject-specific record can be developed before the trial court. *State v. Stenz*, 109 N.M. 536, 538-39, 787 P.2d 455, 457-58 (Ct. App. 1990) ("[Habeas corpus] provides a method for the defendant to present in a post-conviction proceeding a record establishing ineffective assistance of counsel . . . .").

**{50}** Defendant's final claim of ineffective assistance is reviewable based upon the trial record, but we disagree that it establishes a prima facie claim. Defendant argues that counsel was deficient in failing to object to Cavasos's testimony when she recounted statements made by Esquibel to Defendant. Cavasos testified that Esquibel requested Defendant and Tom Bahney watch and ensure the silence of Lumsey while he was gone, and separately stated in Defendant's presence that he was "just going to torch the car." We disagree that the statements were inadmissible hearsay and that her right of confrontation was violated by their admission.

**{51}** Regarding Esquibel's request that Defendant and Tom Bahney watch Lumsey and ensure her ongoing silence while Esquibel attended his court hearing, we hold that the statement was not offered at trial to prove the truth of the matter asserted, and therefore is not hearsay at all. *See* Rule 11-801(C) NMRA ("'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence *to prove the truth of the matter asserted*." (emphasis added)). Here, the challenged statements are best described as directions or commands, rather than assertions from which truth or falsity can be discerned. They are thus not hearsay. *See State v. Toney*, 2002-NMSC-003, ¶ 3, 131 N.M. 558, 40 P.3d 1002 (holding that an out-of-court statement was not hearsay where the statement "was a directive or a command and was offered not for its truth but for the fact that it was made.").

**{52}** Similarly, Esquibel's assertion that he was "just going to torch the car," was not offered to prove the veracity of Esquibel's intent to commit arson, but to demonstrate Defendant's knowledge that Esquibel contemplated burning Lumsey's car. Esquibel's statement, which communicated his then-existing state of mind, was offered by the State to establish Defendant's motive when she later purchased lighter fluid for him. "Evidence is not hearsay if admitted as circumstantial evidence of the motive of the listener." *State v. Rosales*, 2004-NMSC-022, ¶ 17, 136 N.M. 25, 94 P.3d 768 (citing 2 Kenneth S. Broun et al., *McCormick on Evidence* § 249, at 102 & n.12 (John W. Strong ed., 5th ed. 1999)). Furthermore, even if we could characterize Esquibel's out-of-court statements as meeting the definition of hearsay under Rule 11-801(C) , they would fall under the category of utterances identified as "statements which are not hearsay," under Rule 11-801(D)(2)(e) (including "statement[s] by a co-conspirator of a party during the course and in furtherance of the conspiracy"). *State v. Farris*, 81 N.M. 589, 590, 470 P.2d 561, 562 (Ct. App. 1970)

16

("[T]he acts and declarations of one conspirator during the existence of a conspiracy are competent evidence against his co-conspirators." (internal quotation marks and citation omitted)); *see State v. Zinn*, 106 N.M. 544, 552, 746 P.2d 650, 658 (1987) ("[T]here is no requirement under the Confrontation Clause for the prosecution to show that a nontestifying co-conspirator is unavailable to testify when his out-of-court statement is offered into evidence against the defendant/co-conspirator."). Defendant's claim of ineffective assistance thus fails because "trial counsel is not incompetent for failing to make a motion when the record does not support the motion." *Stenz*, 109 N.M. at 538, 787 P.2d at 457.

**{53}** Our conclusion that Defendant has failed to meet her burden of demonstrating a prima facie case of ineffective assistance of counsel in no way impairs Defendant's ability to later bring such a claim in a habeas proceeding if she considers there to be a factual basis for such a motion. *See Saiz*, 2008-NMSC-048, ¶ 65, (noting that a defendant "may pursue habeas corpus proceedings on [the ineffective assistance of counsel] issue . . . if he is ever able to provide evidence to support his claims").

## III. CONCLUSION

**{54}** In summary, we affirm all but one of Defendant's convictions, striking only her conviction for conspiracy to commit aggravated arson. We reject Defendant's remaining challenges regarding the sufficiency of the evidence, the trial court's admission of crime scene photographs, and the effectiveness of her trial counsel. Therefore, we remand this case to the district court to vacate the identified conviction and re-sentence Defendant accordingly.

**{55}  IT IS SO ORDERED.**


                                            _____

                                            **J. MILES HANISEE, Judge**

**WE CONCUR:**


_____
**CELIA FOY CASTILLO, Chief Judge**


_____
**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *State v. Bahney*, No. 29,817**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| AE-SB | Substantial or Sufficient Evidence |

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DJ | Double Jeopardy |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-AA | Aiding or Abetting |
| CL-AC | Accessory |
| CL-AR | Arson |
| CL-CS | Conspiracy |
| CL-HO | Homicide |
| CL-KP | Kidnaping |
| CL-TE | Tampering with Evidence |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-DJ | Double Jeopardy |
| CA-SE | Substantial or Sufficient Evidence |
| | |
| **EV** | **EVIDENCE** |
| EV-AE | Admissibility of Evidence |
| EV-PG | Photographs |
| EV-SS | Substantial or Sufficient Evidence |
| EV-TM | Tampering with Evidence |