Certiorari Denied, August 23, 2017, No. S-1-SC-36579

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number:  2017-NMCA-072**

**Filing Date:  June 28, 2017**

**Docket No. A-1-CA-35507**

**STATE OF NEW MEXICO,**

       **Plaintiff-Appellee,**

**v.**

**BOBBY SAIZ,**

       **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Drew D. Tatum, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John J. Woykovsky, Assistant Attorney General
Albuquerque, NM

for Appellee

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}**     Defendant appeals from the district court's judgment and sentence, convicting him of conspiracy to commit drug trafficking by distribution. Defendant argues: (1) the evidence was insufficient, and (2) the district court improperly admitted a hearsay text message into evidence under the exclusion for statements made by a co-conspirator, pursuant to Rule 11-

1

801(D)(2)(e) NMRA. We must decide whether the State sufficiently proved its theory that Defendant was the middleman in a conspiracy to sell methamphetamine to an undercover agent and a confidential informant, where the drug transaction did not occur, the drugs were never seen, the co-conspirator was never seen or verified, and the bulk of the State's evidence consisted of Defendant's assurances that the transaction would take place. Concerned with the State's heavy reliance on Defendant's extrajudicial statements to prove the conspiracy, we asked the parties to brief the application of the modified trustworthiness rule, New Mexico's modern corpus delicti rule. *See State v. Weisser*, 2007-NMCA-015, ¶ 16, 141 N.M. 93, 150 P.3d 1043 (stating that the goal of both the corpus delicti rule and the trustworthiness standards is to "ensure that individuals are not convicted of crimes [on the basis of unreliable confessions when those crimes] did not in fact occur"), *abrogated on other grounds as recognized by State v. Bregar*, 2017-NMCA-028, ¶ 49, 390 P.3d 212.

{2}     We hold that the corroboration requirements of the modified trustworthiness rule do not apply to Defendant's statements made pre-crime and in the course of the crime. Considering Defendant's statements as proof of the conspiracy, we hold that the evidence was sufficient. We also are not persuaded that the text message constituted hearsay offered to prove the truth of any assertion in the statement. We affirm.

**BACKGROUND**

{3}     Undercover Officer Waylon Rains testified that he and a confidential informant (CI) arranged to meet with Defendant, who was to act as the middleman to facilitate the purchase of four ounces of methamphetamine for $4,800. Officer Rains has been in law enforcement for nineteen years, a lieutenant with the Clovis Police Department for eleven years, and was undercover investigating narcotic crimes and a supervisor in a five-county drug task force on the day in question. The CI was qualified as a credible and reliable resource five years before the incident, had been working continuously since then on hundreds of cases, and had never provided law enforcement with wrong information that might have damaged his credibility.

{4}     Officer Rains and the CI were in contact with Defendant for about two weeks leading up to the incident at issue. Previous transactions were scheduled but did not occur because Defendant was not able to convince a third party to broker a transaction in a manner consistent with the drug task force policy. The drug task force refused to "front" the money for a drug purchase before the drugs were present and refused to trust a person to leave from view with the money and return with the drugs. After several failed attempts at brokering the deal, Officer Rains and the CI received multiple phone calls from Defendant, who was contacting them to let them know he had found a third party who was willing to bring the methamphetamine to them and complete the exchange at one location. For this transaction, Defendant asked Officer Rains and the CI to come to his house, bring the money, and then Defendant would call the third party to bring the methamphetamine.

{5}     When Officer Rains and the CI showed up at Defendant's home in an unmarked

2

vehicle, Defendant came out, and they showed him a "flash roll" of cash to demonstrate their ability and willingness to pay for the methamphetamine. Defendant used his cell phone and spoke to someone he referred to as "Gilbert," who Defendant said was his cousin. He returned to the vehicle and said that Gilbert wanted them to drive to Gilbert's house and complete the transaction there. Because Officer Rains wanted to control as much of the deal as possible to minimize the risk to himself and the CI, he refused to go to a stranger's house. Officer Rains suggested they could complete the transaction in the parking lot of a nearby convenience store because it was close to Defendant's house and Gilbert's house, who was said to have lived in the trailer park behind the convenience store. Defendant got back on his cell phone, walked away, and then returned to the vehicle and reported that the proposed arrangement was not satisfactory to Gilbert. After all negotiations were complete, they finally agreed that Officer Rains and the CI would take Defendant to the trailer park a block or so away from Gilbert's residence; Defendant would go to the residence, get one ounce of meth, and bring it back to the car; the officer would give Defendant the money; then, Defendant would go back to the residence and bring the remaining three ounces to the officer and the CI to complete the transaction.

{6} Officer Rains, the CI, and Defendant drove together in the vehicle to a side street in the trailer park and parked about a block away from the residence. Defendant left the vehicle, walked to the residence, knocked on the door, and talked to a person who opened the door and whom the officer and the CI could not see or hear. Defendant returned to the vehicle and stated that Gilbert was on his way and that they could complete the deal shortly. In an effort not to give the appearance of an undercover law enforcement operation, Officer Rains told Defendant they had a time limit, they were tired of messing around, and that if the deal was not going to happen, then they would leave and get the drugs elsewhere. Defendant remained outside the vehicle after arriving at the trailer park, walking between the yard of Gilbert's home and the yard next door, and was on and off his cell phone numerous times outside of the officer's hearing range. During the thirty to forty minutes that they were at the trailer park, Defendant told Officer Rains that the reason for the delay was that Gilbert had people in the neighborhood doing countersurveillance to see if there was any law enforcement in the area. Shortly thereafter, a white Ford truck came driving up very slowly from the same direction in which the officer's vehicle was facing, passed the officer's vehicle, continued toward Gilbert's home where Defendant was located, slowed down even more when it came close to Defendant, and then accelerated around the corner. Defendant returned to Officer Rains' vehicle, reported that everything was fine, and that it was Gilbert in the truck that just passed by them. Defendant did not say why Gilbert did not stop or if he would come back.

{7} Officer Rains testified that he was concerned that something had gone wrong that had aborted the transaction, so he alerted the cover team—stationed throughout the area that had been monitoring his conversations through listening devices—to attempt to stop a white Ford truck in the area. Officer Rains did not catch the license plate, had little description to offer, and could not see anyone in the truck. Within two to three minutes, other agents stopped a white Ford truck in the vicinity, but Officer Rains could not say whether it was the same truck. In the search of the truck that was stopped, no drugs were found, and no one in the

3

truck was named Gilbert.

**{8}** Back at the trailer park, Officer Rains told Defendant that he was tired of waiting and asked Defendant if he wanted a ride back to his house. Defendant agreed and asked if they could stop at a store so Defendant could buy some cigarettes. On their way to the store, Defendant received a text message on his cell phone, which had a shattered, unreadable screen and was set to speak the content of text messages as they came in. The voice text said, "You better not be f[ ]ing me over, prim." Officer Rains explained during his testimony that "prim" is short for "primo," which is Spanish for "cousin."

**{9}** Also while on the way to the store, Officer Rains alerted the rest of the team to stop his own undercover vehicle and arrest Defendant for conspiracy. After Officer Rains, the CI, and Defendant pulled into the store's parking lot, Defendant got out, started walking toward the store, and the other agents intercepted Defendant; Officer Rains and the CI left. Among those agents was Sergeant Rafael Aguilar of the Clovis Police Department, who testified that Defendant was confused and agitated by his arrest for conspiracy, continually yelling that there was no conspiracy and that he was there to get methamphetamine for himself and would pay for it later.

**{10}** The jury found Defendant guilty of the sole charge of conspiracy to commit trafficking by distribution. Defendant appealed.

**DISCUSSION**

**{11}** On appeal, Defendant argues that the evidence was insufficient and that the voice text was improperly admitted hearsay. We requested that the parties brief the application of the modified trustworthiness rule to Defendant's extrajudicial statements made to Officer Rains and the CI to assist our review of the sufficiency of the evidence to support his conviction. *See, e.g.*, *State v. Pietrzak*, 41 P.3d 1240, 1245 (Wash. Ct. App. 2002) (explaining that the corpus delicti rule serves as both a rule of evidence and a means to challenge the evidence "to protect a defendant from the possibility of an unjust conviction based upon a false confession" (internal quotation marks and citation omitted)); *see also Bregar*, 2017-NMCA-028, ¶¶ 45-49 (addressing the corpus delicti argument in the context of the sufficiency challenge). In response to our request, Defendant contends that there was no proof independent of his statements that would corroborate the truth of his statements or establish the corpus delicti of conspiracy. The State argues that the modified trustworthiness rule does not apply to Defendant's statements because they were made pre-crime and in the course of the crime. We agree with the State and begin our analysis with a discussion of the modified trustworthiness rule and then proceed to address the sufficiency of the evidence.

**A.      The Modified Trustworthiness Standard Does Not Affect Our Analysis of the Evidence**

**1.      Development of the Modified Trustworthiness Standard**

4

**{12}**   In determining whether the corroboration requirements of the modified trustworthiness standard apply to Defendant's extrajudicial statements, we first examine its development from the corpus delicti rule and its purpose. "The term 'corpus delicti,' which literally means 'body of the crime,' refers to the evidence needed to establish that the charged crime was actually committed." *Weisser*, 2007-NMCA-015, ¶ 10 (quoting *Black's Law Dictionary* 369 (8th ed. 2004)). "The [traditional] corpus delicti rule provides that unless the corpus delicti of the offense charged has been otherwise established, a conviction cannot be sustained *solely* on the extrajudicial confessions or admissions of the accused." *Id.* (alteration, internal quotation marks, and citation omitted). The prosecution can prove the corpus delicti of an offense by demonstrating by independent evidence "the fact that a harm or injury occurred and that the harm or injury was caused by a criminal act." *Id.* The two most cited purposes for the corpus delicti rule are (1) "to prevent the conviction of those who confessed to non-existent crimes as a result of coercion or mental illness[,]" and (2) to "promot[e] better police work by requiring the prosecution to prove its case without the aid of confessions." *Id.* ¶ 14 (internal quotation marks and citations omitted).

**{13}**   The traditional corpus delicti rule came under scrutiny for not sufficiently serving its purposes and permitting the guilty to escape punishment and doing so without a constitutional basis. *See State v. Wilson*, 2011-NMSC-001, ¶ 10, 149 N.M. 273, 248 P.3d 315 (noting the widely expressed "concern that the corpus delicti rule was turning into a doctrinal obstacle whereby the guilty can escape punishment" (emphasis, alterations, internal quotation marks, and citation omitted), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110; Thomas A. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti as a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. Rev. 385, 387 (1993) ("No court has ever held that the rule is constitutionally grounded."). In response to these shortcomings, the United States Supreme Court replaced the corpus delicti rule with the "trustworthiness" doctrine, which requires corroboration of the trustworthiness of the defendant's admissions or the essential facts in the defendant's admissions to sustain a conviction based on those admissions. *See Weisser*, 2007-NMCA-015, ¶ 15 (citing *Opper v. United States*, 348 U.S. 84, 93 (1954)). This rule, too, has been criticized as being "so malleable that almost any independent evidence of anything can serve to corroborate the confession or make it trustworthy." *Id.* ¶ 16 (internal quotation marks and citation omitted).

**{14}**   New Mexico courts have also rejected the corpus delicti rule. *See State v. Paris*, 1966-NMSC-039, ¶¶ 9-13, 76 N.M. 291, 414 P.2d 512. The standard that was adopted by our Supreme Court in *Paris* was less than clear, however, and was inconsistently applied for decades. *See Weisser*, 2007-NMCA-015, ¶¶ 17-25 (explaining the lack of clarity in the *Paris* opinion and the inconsistency with which it was applied). Ultimately, this Court and our Supreme Court agreed that New Mexico has rejected both doctrines in their original forms and adopted a modified trustworthiness rule that combines the standards: "an extrajudicial statement may be used to establish the corpus delicti where the statement is shown to be trustworthy *and* where there is some independent evidence to confirm the existence of the

5

alleged loss or injury." *Weisser*, 2007-NMCA-015, ¶ 18 (emphasis added); *see Wilson*, 2011-NMSC-001, ¶¶ 13, 15 (confirming that *Weisser* states the appropriate modified trustworthiness standard used in New Mexico and acknowledging that its application has been inconsistent and unclear). Our review of the corpus delicti jurisprudence shows that few jurisdictions have adopted the hybrid standard that governs in New Mexico. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 592 (9th Cir. 1992) (expressing the court's belief, not expressed by other circuit courts, that United States Supreme Court case law after *Opper* has resurrected the requirement that the government present independent proof that a crime occurred in addition to the corroboration required for the facts in the defendant's statements); *State v. Lucas*, 152 A.2d 50, 61 (N.J. 1959); *State v. Bishop*, 431 S.W.3d 22, 54 (Tenn. 2014) (citing the New Jersey Supreme Court's opinion in *Lucas* and our Supreme Court's opinion in *Wilson* as the two previous cases that adopted the modified trustworthiness standard).

**{15}**     Unfortunately, the unclear development of the modified trustworthiness standard in New Mexico suggests an inconsistent application of the standard and provides us with little understanding of the reasons underlying the decision to afford greater protection for defendants against their own statements as opposed to nearly the entire country. What we glean from our Supreme Court's opinion in *Paris* is that the Court believes confessions " 'stand high in the probative hierarchy of proof[,]' " and therefore, greater safeguards are appropriate and the hybrid approach strikes the better balance between assuring that confessions are true and preventing the guilty from escaping punishment. 1966-NMSC-039, ¶ 11 (quoting *Lucas*, 152 A.2d at 61).

**2.     The Modified Trustworthiness Standard Does Not Apply to Defendant's Statements**

**{16}**     Many jurisdictions have adopted the view that their own corroboration requirements for admissions and confessions apply only to *post*-crime statements or confessions, and not to statements or admissions made before or during the commission of the crime. *See, e.g.*, *Opper*, 348 U.S. at 90; *Warszower v. United States*, 312 U.S. 342, 347 (1941); *Gov't of V.I. v. Hoheb*, 777 F.2d 138, 141-42 (3d Cir. 1985); *United States v. Soteras*, 770 F.2d 641, 644 n.4 (7th Cir. 1985); *United States v. Pennell*, 737 F.2d 521, 537 (6th Cir. 1984); *United States v. Head*, 546 F.2d 6, 9 (2d Cir. 1976); *United States v. Kaechele*, 466 F. Supp. 2d 868, 890-91 (E.D. Mich. 2006); *People v. Chan*, 26 Cal. Rptr. 3d 878, 886 (Cal. Ct. App. 2005); *State v. Johnson*, 821 P.2d 1150, 1162 (Utah 1991); *Pietrzak*, 41 P.3d at 1245-46. This corroboration exception for pre-crime and course-of-crime statements is based on a 1941 United States Supreme Court case stating that the need for corroboration of extrajudicial statements protects against convictions based on false confessions alone and that where such statements are "made prior to the crime [the] danger does not exist" because "[t]hey contain none of the inherent weaknesses of confessions or admissions after the fact." *Warszower*, 312 U.S. at 347. Courts subsequently expanded the *Warszower* exemption for pre-crime statements to statements made during the commission of the crime. *See, e.g.*, *Hoheb*, 777 F.2d at 142 (listing four cases that extended the holding of *Warszower* to apply to statements

6

made during the course of a conspiracy). In *Hoheb*, the Federal Circuit court contrasted "confessions induced or coerced during police investigations, or on other involuntary statements made during that stressful and confused time" with "admissions made while the crime is in progress[, which] bear none of these indicia of unreliability." *Id.* Our review of the relevant case law reveals that it is the majority position to treat pre-crime and course-of-crime statements as falling outside of corroboration requirements. *See, e.g.*, *Johnson*, 821 P.2d at 1162 (characterizing the view that statements made prior to or during the commission of a crime do not need corroboration as "the majority position" and adopting it as "sound policy"). Not all cases however, have followed the principle in *Warszower* and its progeny. *See United States v. Bryce*, 208 F.3d 346, 355-56 (2d Cir. 1999) (requiring corroboration for unknowingly wiretapped statements and creating, without any authority, two categories of statements made in the course of a crime and not requiring corroboration for only one category—those in the nature of self-corroborating statements, which did not include the wiretapped statements); *United States v. Marshall*, 863 F.2d 1285, 1286-87 (6th Cir. 1988) (stating that the corroboration requirement is only for post-offense statements, but nevertheless, the court required corroboration for statements made to an undercover agent in the course of the crime); *United States v. Muskovsky*, 863 F.2d 1319, 1324-25 (7th Cir. 1988) (acknowledging that the defendant could not be convicted of conspiracy based solely on his own uncorroborated admissions made after the conspiracy ended); *United States v. O'Connell*, 703 F.2d 645, 647 (1st Cir. 1983) (stating that whether "*Opper*'s corroboration requirement is limited to admissions made after the completion of the crime and made to a government agent" is a question that "has split the courts," listing cases taking different approaches and refusing to take a position because there was adequate independent corroboration); *United States v. Northrup*, 482 F. Supp. 1032, 1037-38 (D. Nev. 1980) (explaining that the Ninth Circuit has taken internally inconsistent approaches to the timing of the statements and to whom they are made and holding that statements made by a conspirator to an investigator in the life of the conspiracy but after the termination of the conspirator's participation in the conspiracy required corroboration); *United States v. Hallman*, 594 F.2d 198, 201 (9th Cir. 1979) ("[T]he corroboration rule applies only to confessions or admissions made in the course of the commission of the offense or in the course of investigation."); *United States v. Tourine*, 428 F.2d 865, 867-68 (2d Cir. 1970) (concluding that there was sufficient corroboration for statements unknowingly made in the presence of an undercover officer, but not acknowledging the case law that exempts such statements from corroboration). We do not conclude that these cases have articulated a compelling or unifying theory for deviating from the majority approach.

**{17}** New Mexico case law does not address the timing of extrajudicial statements relative to our incarnations of the corpus delicti rule, nor does our law discuss application of the corroboration exception to pre-crime and course-of-crime statements. We observe that the majority position views statements made prior to and in the course of the crime as bearing none of the indicia of unreliability as post-crime confessions and that there is little need for independent proof that the crime occurred as a safeguard against a conviction for an imagined crime where the defendant's statements at issue were made in the course of the crime. *See Johnson*, 821 P.2d at 1162-63. We have found no out-of-state cases suggesting

that the modified trustworthiness standard is inconsistent with the majority approach.

**{18}** We also observe that, as a practical matter in the current case, it makes a strained analysis to separate Defendant's conspiratorial statements made pre-crime or in the course of the crime from the independent evidence of his actions and the circumstances that would corroborate the statements and establish the corpus delicti of the offense. This difficulty is especially pronounced for the crime of conspiracy, which is an inchoate crime with no tangible injury and requires no proof of an act in furtherance of the conspiracy. *See State v. Gallegos*, 2011-NMSC-027, ¶ 59, 149 N.M. 704, 254 P.3d 655; *State v. Lopez*, 2007-NMSC-049, ¶ 21, 142 N.M. 613, 168 P.3d 743 ("An overt act is not required and the crime of conspiracy is complete when the felonious agreement is reached." (internal quotation marks and citation omitted)).

**{19}** Based on these considerations, we adopt the majority position and hold that Defendant's pre-crime and course-of-crime statements are not subject to the modified trustworthiness standard. Therefore, in this case, the offense of conspiracy may be proved through Defendant's statements without the need for independent, corroborative evidence of the truthfulness of the statements or that the crime occurred. *See, e.g.*, *Kaechele*, 466 F. Supp. 2d at 891 (stating that the defendant's statements made during the course of the criminal activity "require no independent corroboration in order to provide a sufficient basis for a jury's determination of his guilt").

**{20}** Next we assess the sufficiency of the evidence to support Defendant's conviction for conspiracy to traffic methamphetamine by distribution, considering Defendant's statements as part of the substantive proof of the offense.

**B.** **The Evidence Was Sufficient to Convict Defendant of Conspiracy**

**{21}** Defendant argues that the evidence did not establish a conspiracy to distribute drugs because Defendant did not receive money from Officer Rains, no drugs were ever produced or verified, and no co-conspirator was ever seen, identified, or verified. Rather, Defendant asserts that the testimony shows that he "was attempting to game Officer Rains and the [CI] to score drugs for himself." The State contends the physical absence of the drugs and co-conspirator are immaterial because the evidence shows Defendant was working with another person to arrange the sale of methamphetamine and that there was an agreement to do so. The State also contends that Defendant's claim that he was "gaming" the officer makes little sense in light of the arrangements and that, in any event, the jury was free to reject Defendant's self-serving explanation. We agree with the State that the evidence was sufficient.

**1.** **Standard of Review for Sufficiency of the Evidence**

**{22}** When assessing the sufficiency of the evidence, the appellate courts "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences

8

and resolving all conflicts in the evidence in favor of the verdict." *State v. Samora*, 2016-NMSC-031, ¶ 34, 387 P.3d 230 (internal quotation marks and citation omitted). We disregard all evidence and inferences that support a different result. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. We then determine whether "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted).

## 2.     Conspiracy

**{23}**     To find Defendant guilty of conspiracy, the State was required to prove to the jury beyond a reasonable doubt that "[D]efendant and another person by words or acts agreed together to commit trafficking of methamphetamine" and that "[D]efendant and another person intended to commit trafficking of methamphetamine[.]" *See* UJI 14-2810 NMRA; *see also* NMSA 1978, § 30-28-2(A) (1979). "The gist of conspiracy under the statute is an agreement between two or more persons to commit a felony." *Gallegos*, 2011-NMSC-027, ¶ 25 (internal quotation marks and citation omitted); *see id.* ¶ 1 (applying "for the first time our unit of prosecution analysis from double jeopardy jurisprudence to multiple conspiracy convictions"). "It is the agreement constituting the conspiracy which the statute punishes." *Id.* ¶ 25 (internal quotation marks and citation omitted). "[A] conspiracy is complete when the agreement is reached." *Id.* ¶ 45 (internal quotation marks and citation omitted). The criminal objective of the agreement need not be achieved in order for a conspiracy conviction to stand, and thus it is also an inchoate crime designed to permit intervention before the underlying illegal activity is complete. *See id.* ¶ 59. It is also considered a continuing crime that can expand or mature over time and add criminal objectives or members without changing the fundamental nature of the agreement. *See id.* ¶ 46. As a continuing crime, "[i]t ends only when the purposes of the conspiracy have been accomplished or abandoned." *Id.* (internal quotation marks and citation omitted). At its core, "[c]onspiracy was criminalized to address the special and continuing dangers incident to group activity" with illegal objectives. *Id.* ¶ 59 (internal quotation marks and citation omitted).

**{24}**     Due to the typically clandestine nature of conspiracies, the prosecution's proof of a conspiracy is seldom direct evidence of the agreement. *See id.* ¶ 45. Usually the jury must "infer the existence of an agreement based on the defendant's conduct and surrounding circumstances, which raises at least the specter of conviction by guess and speculation." *Id.*

## 3.     Analysis of the Evidence

**{25}**     Unlike a more typical conspiracy case that requires us to assess the inferences that may be drawn from the circumstantial evidence, the main evidence of the agreement in the

current case was direct evidence—Defendant's statements, assuring Officer Rains and the CI of the existence of an agreement to sell them methamphetamine, and his actions attempting to achieve the sale—and there was little supporting circumstantial evidence. The jury's verdict demonstrates that it credited Defendant's statements with truth and rejected the "gaming" defense that Defendant had imagined the conspiracy to obtain drugs for himself. As an appellate court, we will "not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting [our] judgment for that of the jury." *Garcia*, 2016-NMSC-034, ¶ 15 (alterations, internal quotation marks, and citation omitted). To be consistent with our standard of review, we do not adopt Defendant's theory of the evidence and will not indulge in inferences based on the absence of the drugs and co-conspirator from the evidence that would support Defendant's version of events. *See State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." (internal quotation marks and citation omitted)); *Rojo*, 1999-NMSC-001, ¶ 19 (same); *see also Samora*, 2016-NMSC-031, ¶ 34 (stating that the appellate courts "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict" (internal quotation marks and citation omitted)). Assuming the truth of Defendant's statements, we proceed to assess the evidence that supports the finding of an agreement between Defendant and another person to sell methamphetamine.

**{26}** After a few failed attempts to broker a drug transaction, Defendant contacted Officer Rains, working undercover, to report that he had found a third party who was willing to meet the officer's requirement to bring the methamphetamine in order to complete the exchange at one location. Defendant and Officer Rains arranged to meet at Defendant's residence and then proceeded with the plan. After Officer Rains and the CI went to Defendant's residence and showed Defendant the purchase money, Defendant used his cell phone to call his cousin, Gilbert, the third party to the plan. Defendant reported that Gilbert would not come to his house and instead proposed that Officer Rains and Defendant go to Gilbert's residence for the transaction. The officer refused this proposal, explaining in his testimony that he could not exercise the desired level of control within that environment. For purposes of a conspiracy agreement, it is immaterial that the officer did not agree to this transaction, because neither a law enforcement officer nor a government agent can be a co-conspirator. *See Pennell*, 737 F.2d at 536 ("[P]roof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction."). The agreement must be shown to exist between the defendant and a non-governmental agent. *See, e.g.*, *United States v. Jones*, 765 F.2d 996, 1002 (11th Cir. 1985) (explaining that the agreement between the undercover narcotics agent and the defendant could not support the conspiracy, rather, it needed to be established between the defendant and other non-governmental participants in the plan).

**{27}** In addition to Defendant's assurances that Gilbert was willing and able to provide the drugs, once all parties to the transaction appeared to have reached an agreement on the

10

location, there was some circumstantial evidence of the existence of the co-conspirator. Defendant's actions appeared to be those of a person attempting to broker and execute a clandestine drug deal by continually talking on the phone in a secretive manner, pacing, waiting, renegotiating, and changing locations. Defendant explained that Gilbert had people countersurveilling the neighborhood for law enforcement, and then shortly thereafter, a white Ford truck passed the renegotiated location in a suspiciously slow manner and then sped off, which suggested that the occupants of the truck were present to observe the scene. Defendant assured Officer Rains and the CI that everything was fine because Gilbert was in that truck. Also, after the truck passed by, the evidence showed that Defendant had received a voice text saying, "You better not be f[ ]ing me over, prim." Indulging inferences in favor of the verdict, we infer from the circumstances that this message was from Gilbert, and it could imply an intent to complete the transaction with cautious optimism that it would take place without incident. Again, the fact that Officer Rains abandoned the plan before the transaction was achieved is not relevant to whether the conspiratorial agreement was reached between Defendant and Gilbert. *See Gallegos*, 2011-NMSC-027, ¶¶ 45, 59 (explaining that conspiracy is an inchoate crime for which the illegal objective need not be achieved and is complete when the agreement is reached); *see also Jones*, 765 F.2d at 1002 (same).

**{28}** Additionally, the co-conspirator does not need to have been convicted or charged or even specifically identified in order to sustain a conspiracy conviction. *See State v. Gonzales*, 2008-NMCA-146, ¶ 11, 145 N.M. 110, 194 P.3d 725 (holding that where surveillance footage showed a grainy depiction of several people burglarizing a store and the jury believed that the defendant was one of them, the fact that the other burglars were not identified or proved to have any relationship to the defendant did not undermine his conspiracy to burglarize conviction); *see also State v. Verdugo*, 1969-NMSC-008, ¶ 9, 79 N.M. 765, 449 P.2d 781 (holding that the dismissal of charges against the co-conspirator did not preclude the defendant's conspiracy conviction).

**{29}** We also observe that an agreement on the specific details of the conspiratorial agreement need not be reached or proved and that the agreement may mature over time without changing the nature of the agreement or the essential illegal objective. *See Gallegos*, 2011-NMSC-027, ¶ 46. New Mexico case law has stated that "[w]hile common design is the essence of a conspiracy, this fact may be established by evidence other than that the parties came together and actually agreed upon a method of operation for the accomplishment of the offense." *State v. Deaton*, 1964-NMSC-062, ¶ 6, 74 N.M. 87, 390 P.2d 966. "A mutually implied understanding is sufficient so far as combination or confederacy is concerned, and the agreement is generally a matter of inference deduced from the facts and circumstances, and from the acts of the person accused done in pursuance of an apparent criminal purpose." *Id.*

**{30}** We are persuaded that the supporting circumstantial evidence, though less substantial than the direct evidence, is legally sufficient to prove an agreement to traffic drugs and an intent to do so. We recognize the warnings from our Supreme Court to be circumspect in identifying a criminal conspiracy, at least for double jeopardy purposes, in light of the

11

malleability of its definition. *See Gallegos*, 2011-NMSC-027, ¶ 47. *Gallegos* cautioned courts to be mindful of the inherent dangers in the "looseness and pliability" of conspiracy and to be vigilant in defining a conspiracy, which is often inferred from the circumstances, and which "raises at least the specter of conviction by guess and speculation." *Id.* ¶¶ 44-45, 47 (internal quotation marks omitted). Although the State's evidence gives rise to these concerns, it provided sufficient proof of the elements. In accordance with our standard of review to accept the jury's findings where there is supporting evidence and to ignore all contrary evidence and inferences, we affirm Defendant's conviction.

## C.    The Voice Text Was Not Inadmissible Hearsay

**{31}**    In his final claim of error, Defendant argues that the district court wrongfully admitted evidence of the voice text that was spoken from his cell phone as a non-hearsay statement offered against the party-opponent "made by the party's co-conspirator during and in furtherance of the conspiracy[,]" under Rule 11-801(D)(2)(e). As we stated earlier in this opinion, Officer Rains testified that the voice text read aloud, "You better not be f[ ]ing me over, prim." The district court overruled Defendant's objection to the admission of the voice text, determining that the State laid a sufficient foundation that "prim" is short for "primo," which means "cousin" in Spanish, and that the voice text was reasonably inferred to be from Gilbert, Defendant's purported cousin and co-conspirator.

**{32}**    Defendant argues that the foundation was inadequate, relying on *State v. Farris*, 1970-NMCA-067, ¶¶ 9-10, 81 N.M. 589, 470 P.2d 561, for the proposition that a statement by a co-conspirator can be admitted only where the evidence has demonstrated a common purpose or design between the alleged co-conspirator and the defendant; the statement, alone, cannot establish the conspiracy. *But see, e.g.*, *State v. Zinn*, 1987-NMSC-115, ¶¶ 32-33, 106 N.M. 544, 746 P.2d 650 (stating that "the foundational requirement of proof of a conspiracy by independent evidence need not be met at the time the [prosecution] offers the co-conspirator's statement[,]" because the district court may rule on the condition that the prosecution establish the conspiracy by independent evidence).

**{33}**    "We review the admission of hearsay evidence for an abuse of discretion." *State v. King*, 2015-NMSC-030, ¶ 23, 357 P.3d 949 (internal quotation marks and citation omitted). We begin by determining whether the voice text was hearsay. *See id.* ¶¶ 23-32 (determining first that the officer's testimony recounting the defendant's statement was hearsay offered into evidence for its truth to establish self-defense and then proceeding to decide that the statement does not fall within any hearsay exception).

**{34}**    "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *Id.* ¶ 24 (internal quotation marks and citation omitted); *see* Rule 11-801(C). " 'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion*." Rule 11-801(A) (emphasis added). "By definition, then, statements or conduct which are non-assertive are not hearsay." *Jim v. Budd*, 1987-NMCA-079, ¶ 10, 107 N.M. 489, 760 P.2d 782. In *Jim*, this Court held that where the

challenged, extrajudicial statement was a direction made by the plaintiff to the defendant—"let the gates down against the chain"—the statement was "not an assertion that would either be true or false." *Id.* ¶ 13 (internal quotation marks omitted). We held that where the statement was "not offered for the truth of the words uttered . . . [but r]ather . . . offered to show [that the plaintiff was] in control of the procedure and that he knew what he was doing[,]" the statement was not hearsay. *Id.* ¶¶ 11, 13. We further held that, to the extent that assertions may be implied by the statement, implied assertions are not hearsay. *Id.* ¶¶ 11-12.

{35}     The statement at issue in the current case is an implied expression of skepticism about Defendant's intentions or actions, and/or it is an implied warning or an implied threat of an undefined consequence. Like the directive by the plaintiff in *Jim*, which was not used to prove the truth of the matter asserted, the statement here, "You better not be f[  ]ing me over, prim[,]" was not offered to prove the truth of the matter asserted. The statement is relevant and offered into evidence because the statement was made to Defendant at the time and under the circumstances that it was made to Defendant. *See State v. Aragon*, 1973-NMCA-102, ¶ 7, 85 N.M. 401, 512 P.2d 974 ("A statement made may be admitted merely to prove that it was made and not to prove that it is true."); *see also State v. Toney*, 2002-NMSC-003, ¶ 3, 131 N.M. 558, 40 P.3d 1002 (holding that the defendant's command to another person to leave the victim at the river was not hearsay because it was not an assertion and it "was offered not for its truth but for the fact that it was made").

{36}     Because we are not persuaded that the voice text was an intended assertion that was being offered for the truth of the matter asserted, we hold that the statement, as used, did not constitute hearsay. Therefore, we need not address whether the statement was properly admitted under the hearsay exclusion for a statement made by a co-conspirator during and in furtherance of the conspiracy under Rule 11-801(D)(2)(e). *See State v. Flores*, 2010-NMSC-002, ¶ 44, 147 N.M. 542, 226 P.3d 641 (explaining that the appellate courts may uphold a district court's admission of an extrajudicial statement if the ruling is right for any reason under the hearsay rules).

**CONCLUSION**

{37}     For the foregoing reasons, we hold that sufficient evidence supports Defendant's conviction for conspiracy to commit drug trafficking by distribution and that the district court did not abuse its discretion by admitting the voice text. The district court's judgment and sentence are affirmed.

{38}     **IT IS SO ORDERED.**

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**


_____

**HENRY M. BOHNHOFF, Judge**